# FOR PUBLICATION



ATTORNEY FOR APPELLANT:

**SHAWN C. SWOPE**
Swope Law Offices, LLC
Schererville, Indiana

ATTORNEY FOR APPELLEE:

**ADAM J. SEDIA**
Rubino, Ruman, Crosmer & Polen
Dyer, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| LLOYD J. DIEHL, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 45A04-1309-CT-460 |
| | ) | |
| LARRY J. CLEMONS, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Diane Kavadias Schneider, Judge
Cause No. 45D11-1110-CT-194

**June 25, 2014**

**OPINION – FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE

Lloyd J. Diehl appeals the trial court's order granting Larry J. Clemons' motion to correct error, following a jury trial, and ordering a new trial on the question of damages owed by Diehl to Clemons. Diehl raises three issues for our review, which we restate as the following two issues:

1. Whether the trial court complied with the requirements of Indiana Trial Rule 59(J) when it ordered a new trial on the basis that the jury verdict was inadequate; and

2. Whether the court abused its discretion when it ordered a new trial on the basis of juror misconduct.

We reverse and remand with instructions.

## FACTS AND PROCEDURAL HISTORY

On August 26, 2010, Diehl drove his vehicle into the rear of Clemons' vehicle. On October 18, 2011, Clemons filed a complaint alleging injuries as a result of the collision. On January 28, 2013, Diehl admitted fault in causing the collision but denied that the collision had caused Clemons any damages. The trial court held a two-day jury trial on the question of damages only on May 20 and 21, 2013. See Transcript at 5.

At trial, Clemons' counsel called Allen Loser, the paramedic who responded to the scene of the collision and who treated Clemons in the ambulance on the way to the hospital. According to Loser, upon his arrival at the scene Clemons complained about neck and back pain, which resulted in Loser placing Clemons in a cervical collar and on a spine board. Loser also checked Clemons' vital signs and found that Clemons had an elevated blood pressure, which Loser testified was "expected" following a vehicular

2

collision and in light of Clemons' "history of having high blood pressure." Id. at 171-72. Nonetheless, Loser was "[c]oncern[ed] enough that [he] started an IV." Id. at 173.

But, on cross-examination by Diehl's counsel, Loser testified that he had described the vehicular collision in his notes as "minor," which was "based on what [Loser] observed as [he] approached the truck [and] on what [he] could expect for injuries." Id. at 178. Loser then stated that his records from the scene indicated that Clemons displayed "[g]ood . . . [r]ange of motion" and that Clemons had "denie[d] any other . . . complaints" aside from pain in his neck and back. Id. at 179. Loser also answered "[n]o" when asked whether "there [was] anything particular about this case with the blood pressure that caused you alarm." Id. at 180.

Following Loser's testimony, Clemons' counsel introduced the videotaped deposition testimony of Dr. Christopher McIntire, an osteopathic physician who had been Clemons' physician since about 2005 or 2006. Dr. McIntire testified that Clemons had visited him on August 31, 2010, complaining of neck and back pain as a result of the August 26 collision. Upon examining Clemons, Dr. McIntire diagnosed Clemons with whiplash, cervical strain, thoracic sprain strain, lumbosacral strain, myositis, myalgia, and soft tissue injury, all as a result of the collision. Dr. McIntire then testified as follows:

> Q (by Clemons' counsel): Doctor, you talked about degenerative disc disease that Mr. Clemons had. And obviously you had indicated that that is an aging process?
>
> A    Correct.
>
> Q    . . . explain for the jury [the] aging process as far as Mr. Clemons or just the public in general.

3

A   When it comes to the body we aren't the same as we were the day that we were born, and as we age things begin to deteriorate. . . .

Q   Doctor, somebody with degenerative disc disease does that make them more susceptible to being injured in a car crash like Mr. Clemons was in?

A   Does it make them more susceptible to having an injury, yes.

Q   How so . . . ?

* * *

A   In a child we have much more flexibility.  We don't have as firm of the bone structures themselves.  The tendons are much more elastic than what we have in the aging process.  So then based on age, given the accident, that it would make him more susceptible.

Id. at 227-28.

On cross-examination by Diehl's counsel, Dr. McIntire agreed that a complete and accurate medical history by Clemons was required to properly form an opinion about the cause of Clemons' symptoms.  Diehl's counsel then questioned Dr. McIntire about Plaintiff's Exhibit 8, which was the record of Clemons' medical history with Dr. McIntire.  According to that record, Dr. McIntire had noted that Clemons' complaints of neck and back pain on August 31 were "new problem[s]," each of which had "started in the past 7 days."  Appellant's App. at 198.  Dr. McIntire acknowledged that these records demonstrated that Clemons had never previously complained of any neck or back problems.  See Transcript at 246-47; see also id. at 268 (discussing Clemons' medical records from 2011 through 2013).  But Donna Rosenthal-Cochran, Clemons' physical therapist at APT Plus, testified on cross-examination by Diehl's counsel that Clemons has fibromyalgia, which causes "chronic widespread pain[] and makes a person sensitive to

4

touch." Id. at 332. And Clemons' daughter testified that Clemons had been involved in "several" prior car accidents that had resulted in injuries to Clemons. Id. at 159. Dr. McIntire also acknowledged that Clemons' medical records demonstrated that Clemons had never previously complained of any problems related to degenerative changes. See Transcript at 246-47, 268.

Further, Dr. McIntire testified that his records following the collision demonstrated a normal range of motion in Clemons' neck at the time of the examination; that Clemons demonstrated no tenderness in his chest; and that the record for Clemons' "[m]uscoloskeletal also says normal range of motion." Id. at 263. And while Dr. McIntire testified that he had prescribed Clemons Loritab, or hydrocodone, "for pain," id. at 268, he then acknowledged that this prescription had begun in May of 2010, about three months before the collision, id. at 269-71. Dr. McIntire also acknowledged that nothing about the prescription had changed following the collision. Id. And Diehl's counsel questioned Dr. McIntire's note in Clemons' medical record that read, "Do not settle until cleared with me." Id. at 265.

Diehl's counsel also cross-examined Dr. McIntire on whether Clemons' medical bills were related to the vehicular collision. In particular, Diehl's counsel noted that each of Dr. McIntire's medical bills expressly stated "no" where prompted to enter whether the bill was related to the "auto accident," and Dr. McIntire acknowledged that this was "correct." Id. at 274-75. Dr. McIntire also acknowledged that the bills from APT Plus, to which Dr. McIntire had referred Clemons for physical therapy, stated "no" where prompted to enter whether the bills were related to an "auto accident." Id. at 275.

5

Clemons testified during his own direct examination that, while his automobile insurance policy with State Farm had paid for his medical bills, including his ambulance and emergency room visit, "[a]s far as [he] kn[e]w," Clemons had to "pa[y] back" State Farm.[1]  Id. at 352.  On cross-examination, Diehl's counsel drew Clemons' attention to three separate claim forms that had been filed with State Farm in which each treating physician had marked "no" when asked whether Clemons' condition following the collision was related to an "auto accident."  Pl.'s Exh. 10 at 5, 13-14.  Diehl's counsel then engaged Clemons in the following colloquy:

> Q      . . . If you could get State Farm to pay these bills and if you get those submitted where it says, not car accident, then not only do you get the bills paid, but you don't have to pay back State Farm.  You get to keep that money; correct?
>
> A      I don't know.
>
> Q      You don't know, okay.  By the way, State Farm, once they were submitted to State Farm for the accident, State Farm paid every single one of your bills; correct?
>
> A      As far as I know.
>
> Q      . . . Sir, as you're sitting here today do [you] have even one penny of outstanding bills?
>
> A      . . . I don't think so.

Transcript at 357-58.

Diehl's counsel then impeached Clemons' testimony regarding the severity of the accident and his condition at the scene of the collision.  In particular, Diehl's counsel read to the jury Clemons' deposition testimony, in which Clemons testified that the

---

[1] The trial court admitted evidence of Clemons' insurance at the request of Clemons' counsel and over the objection of Diehl's counsel.

impact from the collision had caused his body to move "[j]ust up a little bit and then right back." Id. at 365. Diehl's counsel also read Clemons' deposition testimony that, at the scene, Clemons had "told [Loser] that it seemed like I was fine. I was just a little nervous." Id. at 367.

After Clemons' counsel rested his case, Diehl's counsel asked the court to reiterate to the jury that the only question before it was the amount, if any, of Clemons' damages resulting from the collision.[2] The court did so, and Diehl's counsel rested his case without calling any witnesses. The jury then returned a verdict for Clemons in the amount of zero dollars.

On June 7, 2013, Clemons filed a motion to correct error, pursuant to Indiana Trial Rule 59(A), in which he alleged that the jury's award of zero dollars was inadequate in light of the evidence. Clemons also alleged that one of the jurors, Juror Number 289, had committed misconduct when that juror failed to state on his juror questionnaire that, nearly twelve years prior to Clemons' jury trial, he had been a defendant in a civil lawsuit that arose from a vehicular collision. In support of his argument for juror misconduct, Clemons attached the affidavit of an attorney from the same law firm as the plaintiff's attorney in the juror's prior lawsuit. That affidavit stated that a complaint had been filed against Juror Number 289 but did not discuss how much progress the action had made, how much contact the plaintiff's attorney had had with Juror Number 289 or his attorney, or what the ultimate resolution of that case was. See Appellant's App. at 232.

---

[2] Clemons did not present any evidence of property damage during the trial.

7

In his response to Clemons' motion on the issue of juror misconduct, Diehl attached the docket for Juror Number 289's case, which showed that the cause had been dismissed with prejudice for failure to prosecute. Id. at 245. Moreover, during voir dire Juror Number 289 stated that there are "absolutely" times when "lawsuits [are] appropriate," such as "[w]rongful death, wrongful injury, damage to property, things like that, I think, where clearly a law has been broken and the person bringing the lawsuit feels . . . that for whatever reason the extent of justice they've received so far isn't commensurate to what they feel they need." Transcript at 30-31. At the time, Clemons' counsel responded, "Very well put." Id. at 31.

On August 21, the trial court entered its order granting Clemons' motion and agreeing with each of Clemons' arguments. In particular, omitting only formal parts, procedural history, and recitations of law, the court's order stated as follows:

## FINDINGS OF FACT

\* \* \*

5.    At trial, Plaintiff called medical experts to testify regarding the Plaintiff's medical injuries.

6.    Al Loser, one of the Emergency Medical Technicians who treated the Plaintiff after the accident, testified that the Plaintiff experienced pain and elevated blood pressure after the collision.

7.    Christopher McIntire, D.O., Plaintiff's treating physician, testified that the Plaintiff suffered from a degenerative disc condition that was aggravated by the collision and will require continuing treatment for pain indefinitely.

8.    Defendant called no medical experts or physicians to testify regarding the Plaintiff's symptoms and medical treatment after the collision. Nor did the Defendant offer any evidence to contradict Dr.

8

McIntire's testimony that the collision aggravated the Plaintiff's pre-existing degenerative condition.

9.      After the trial, new evidence surfaced regarding juror misconduct by Juror Number 289.

10.     On his juror questionnaire, Juror Number 289 answered that he had never been party to a civil suit.

11.     However, a post-verdict investigation has revealed that Juror Number 289 was in fact a defendant in a civil suit filed in the Lake Superior Court.

\* \* \*

## CONCLUSIONS OF LAW

\* \* \*

8.      In this case, the only medical experts that testified were the Plaintiff's treating physician and attending emergency medical technician. The Plaintiff presented evidence that he was taken away from the collision by ambulance and immediately hospitalized and treated following the collision. Furthermore, the Plaintiff's treating physician testified that the Plaintiff's post-collision injuries and pain were attributable to the collision having aggravat[ed] the Plaintiff's pre-existing degenerative condition.

9.      The Defendant, through cross-examination, disputed the causation and existence of the Plaintiff's injuries. Specifically, the Defendant contended that the Plaintiff's alleged soft tissue injuries were based entirely upon subjective complaints. However, the Defendant presented no expert testimony to contradict that the Plaintiff incurred medical expenses as a result of the collision.

10.     The jury awarded the Plaintiff zero dollars ($0) in damages. The record reveals that this damage award did not compensate the Plaintiff for even the actual, undisputed medical expenses, which were incurred as a result of the accident at issue. Therefore, because the jury's award failed to compensate the Plaintiff for actual, undisputed medical expenses that are directly attributable to this collision, this Court finds the verdict to be inadequate as a matter of law because it is clearly against the weight of the evidence.

\* \* \*

9

16.    Here, it is undisputed that [Juror Number 289], presiding juror (formerly foreperson) in this case, failed to honestly answer the question on his juror questionnaire that asked whether he had ever been a party to a civil lawsuit.  [The juror] answered no when he had actually been sued as a defendant in a civil lawsuit twelve years prior.  In said action, [the juror] was sued for damages allegedly resultant from a rear end car collision . . . .  The plaintiff in said action was represented by attorney Angel Buoscio.  This question is material because it is a threshold question that allows the parties to inquire into any bias a potential juror may have based on previous experience with the civil justice system.

17.    Also during voir dire, Plaintiff's counsel questioned one [of] the potential jurors about her relation to the late attorney, Angel Buoscio.  When the potential juror responded that she was related to Angel Buoscio, Plaintiff's counsel spoke favorably of Mr. Buoscio and offered condolences on his recent death.  [Juror Number 289] was seated with the potential juror during this dialogue.[3]

18.    As a result of the dialogue concerning Angel Buoscio, in addition to [the] untruthful answer and his selection by the jury as presiding juror, this Court finds that [the juror] failed to disclose a material fact which concealed a potential source of bias against the Plaintiff and likely harmed the Plaintiff by denying him a fair trial before an impartial jury.  Accordingly, this Court finds that [the juror's] false statement on his juror questionnaire constitutes gross misconduct that has denied the Plaintiff a fair trial.

Appellant's App. at 15-18. (emphases added).  The court then ordered a new trial on the question of damages.  This appeal ensued.

## DISCUSSION AND DECISION

### Overview

Clemons filed his motion to correct error pursuant to Indiana Trial Rule 59(A), which states:

Motion to correct error—When mandatory.  A Motion to Correct Error is not a prerequisite for appeal, except when a party seeks to address:

---

[3] This potential juror was not selected as an actual juror.

10

(1) Newly discovered material evidence, including alleged jury misconduct, capable of production within thirty (30) days of final judgment which, with reasonable diligence, could not have been discovered and produced at trial; or

(2) A claim that a jury verdict is excessive or inadequate. . . .

On appeal, Diehl asserts that the trial court erred when it ordered a new trial both on the basis that the jury verdict was inadequate and on the basis of juror misconduct. In particular, Diehl contends that the trial court's order fails to state the special findings necessary to justify setting aside the jury verdict and that the trial court's assessment that juror misconduct required a new trial was an abuse of the court's discretion. We address each issue in turn.

## Issue One:  Adequacy of the Jury Verdict

We first consider whether the trial court's order for a new trial on the basis of an inadequate jury verdict under Trial Rule 59(A)(2) was erroneous. Our Supreme Court has explained our standard of review and the trial court's obligations under Trial Rule 59 as follows:

> As a general matter, a decision to grant a new trial (often called "acting as the thirteenth juror") is reviewed for an abuse of discretion, and the trial court's decision is given a strong presumption of correctness. Weida v. Kegarise, 849 N.E.2d 1147 (Ind. 2006); see also Lake Mortg. Co. v. Federal Nat'l Mortg. Ass'n, 262 Ind. 601, 321 N.E.2d 556 (1975). The strong presumption of correctness only arises if the court's decision is supported by the special findings required by Trial Rule 59(J). . . .
>
> Indiana Trial Rule 59(J) authorizes trial courts to grant new trials to correct an error in prior proceedings. In all cases where relief is granted, the court is required to "specify the general reasons" for granting relief. Setting aside a jury's verdict and granting a new trial is not to be done lightly, thus Rule 59(J) requires that, when granting a new trial because the verdict does not accord with the evidence, judges must

make special findings of fact upon each material issue or element of the claim or defense upon which a new trial is granted. Such finding shall indicate whether the decision is against the weight of the evidence or whether it is clearly erroneous as contrary to or not supported by the evidence; <u>if the decision is found to be against the weight of the evidence, the findings shall relate the supporting and opposing evidence to each issue upon which a new trial is granted</u>; if the decision is found to be clearly erroneous as contrary to or not supported by the evidence, the findings shall show why the judgment was not entered upon the evidence.

Ind. Trial Rule 59(J).

We have long held that strict compliance with the substantive and procedural requirements of Trial Rule 59(J) is of "paramount" importance. <u>Nissen Trampoline Co. v. Terre Haute First Nat'l Bank</u>, 265 Ind. 457, 464, 358 N.E.2d 974, 978 (1976). Specific findings are necessary to temper the use of the "extraordinary and extreme" power to overturn a jury's verdict by assuring that the decision is based on a complete analysis of the law and facts. <u>Id.</u> at 464-65, 358 N.E.2d at 978. In <u>Weida v. Kegarise</u>, we explained that the most important reason for Rule 59(J)'s "arduous and time-consuming requirements," <u>Nissen</u>, 265 Ind. at 464-65, 358 N.E.2d at 978, is "to assure the public that the justice system is safe not only from capricious or malicious juries, but also from usurpation by unrestrained judges." <u>Weida</u>, 849 N.E.2d at 1153. In other words, when a "court overrides the jury in its special domain and substitutes its own verdict for theirs without a clear showing that the ends of justice required it, it is likely that they did not." <u>State v. White</u>, 474 N.E.2d 995, 1000 (Ind. 1985). When a court grants a new trial without making the specific findings, the remedy on appeal is to reinstate the jury verdict. <u>Weida</u>, 849 N.E.2d 1147.

<u>Walker v. Pullen</u>, 943 N.E.2d 349, 351-52 (Ind. 2011) (emphases added; footnote omitted).

Here, Diehl asserts that the trial court's order fails to explain sufficiently why the jury verdict must be set aside as inadequate. We agree. The trial court's order fails to explain the "opposing evidence" on the question of damages. <u>See</u> T.R. 59(J). In particular, in its order the trial court failed to seriously address the litany of evidence

12

brought forth by Diehl's counsel in his cross-examination of Clemons' witnesses. This evidence included the following in support of Diehl's position that Clemons suffered no damages from the collision:

- Clemons' deposition testimony that, at the scene, he had described himself as "fine" but "a little nervous," Transcript at 367;

- Clemons' deposition testimony that the impact caused his body to move "[j]ust . . . a little bit," id. at 365;

- Loser's testimony that Clemons' blood pressure at the scene did not cause him any alarm with respect to Clemons' condition, id. at 180;

- Loser's testimony that he had described the collision in his notes as "minor," id. at 178;

- Loser's testimony that Clemons displayed "[g]ood . . . [r]ange of motion" at the scene, id. at 179;

- Evidence that Dr. McIntire did not have a complete and accurate medical history at the time of his diagnoses, including Rosenthal-Cochran's testimony that Clemons suffered from fibromyalgia, id. at 332, and Clemons' daughter's testimony that Clemons had been in "several" prior car accidents that had resulted in injuries to Clemons, id. at 159;

- Dr. McIntire's acknowledgment that Clemons' medical records demonstrated that Clemons had never previously complained of degenerative changes, id. at 246-47, 268;

- Dr. McIntire's testimony that Clemons displayed a normal range of motion in his neck and body as well as no tenderness in his chest just a few days after the collision, id. at 263;

- Dr. McIntire's acknowledgement that Clemons had been taking prescription painkillers three months before the collision and that this prescription was not changed in light of the collision, id. at 268-71;

- Dr. McIntire's acknowledgement that Clemons' medical bills expressly disclaimed that they were related to a car accident, id. at 274-75;

- Clemons' admission that State Farm had paid all of his medical bills and that Clemons had no outstanding medical bills, id. at 357-58; and

- Clemons' inability to refute on cross-examination that he did not have to pay back State Farm for its payments towards his medical bills, id.

The trial court's failure to assess this and other opposing evidence and relate it to the question of damages is reversible error. See Walker, 943 N.E.2d at 352.

Further, the trial court concluded that Clemons' medical expenses were "undisputed" in that "the Defendant presented no expert testimony to contradict that the Plaintiff incurred medical expenses as a result of the collision." Appellant's App. at 17. The court then reasoned that the jury verdict of zero dollars in damages was "inadequate as a matter of law because it is clearly against the weight of the evidence." Id. We cannot agree. The court's conclusion that Clemons' medical expenses were "undisputed" is contrary to the record. Expert testimony was not the only means available for Diehl to contradict Clemons' claim for damages. As shown above, there was opposing evidence

14

that Clemons' medical expenses were not attributable to the collision and that Clemons admitted State Farm had paid all of his medical bills. Thus, the trial court failed to address the opposing evidence and to relate both the supporting and opposing evidence to the damages issue upon which a new trial was granted, all of which is required when a trial court finds that a verdict is against the weight of the evidence. See T.R. 59(J).

We acknowledge that "Indiana subscribes to the general principle of tort law that all damages directly attributable to the wrong done are recoverable. Additionally, the law allows an injured plaintiff to recover the reasonable costs of necessary medical expenses." Russell v. Neumann-Steadman, 759 N.E.2d 234, 237 (Ind. Ct. App. 2001). But it is equally true that "[a] jury is to be afforded great latitude in making damage award determinations," and "[a] verdict will be upheld if the award falls within the bounds of the evidence." Id. Moreover:

> The trial court may only reverse a jury verdict when it is apparent from a review of the evidence that the amount of damages awarded by the jury is so small or so great as to clearly indicate that the jury was motivated by prejudice, passion, partiality, corruption or that it considered an improper element.

Id. (citation and quotations omitted). As explained above, the trial court's special findings here fail to explain how the jury verdict was either improper or not "within the bounds of the evidence." See id.

We also reject Clemons' argument on appeal that requiring the trial court to discuss Diehl's cross-examination evidence "seeks to impose a standard of special findings that is impossibly high, given the realities of trial procedure." Appellee's Br. at 8. As our Supreme Court has made clear, compliance with Rule 59(J) is intended to be

15

"arduous and time[ ]consuming," and the requirement that the court comply with that Rule is "strict" and "paramount." Walker, 943 N.E.2d at 352 (quotations omitted). Such burdens "assure the public that the justice system is safe not only from capricious or malicious juries, but also from usurpation by unrestrained judges." Id. (quotation omitted). And when a "court overrides the jury . . . and substitutes its own verdict for theirs without a clear showing that the ends of justice required it, it is likely that they did not." Id. (quotation omitted).

In sum, the trial court's special findings on this issue do not comply with the strict and paramount requirements of Trial Rule 59(J). Thus, the court's judgment that a new trial is warranted in light of the alleged inadequacy of the jury verdict cannot stand. See id. And "[w]hen a court grants a new trial without making the specific findings, the remedy on appeal is to reinstate the jury verdict." Id.

**Issue Two: Juror Misconduct**

Diehl also asserts that the trial court committed reversible error when it ordered a new trial on the basis that Juror Number 289 had committed misconduct. As an initial matter, we note that our standard of review on this issue is different than our standard of review under Issue One. As stated in Walker, Rule 59(J)'s requirement of special findings applies "when granting a new trial because the verdict does not accord with the evidence." 943 N.E.2d at 352. In all other cases, Rule 59(J) requires only that, "[i]f corrective relief is granted, the court shall specify the general reasons therefor." T.R. 59(J); see Walker, 943 N.E.2d at 352. As explained in the original comments of the Civil Code Study Commission to Rule 59 when it was proposed for adoption in 1970:

16

> In granting a new trial, the trial court [i]s required to state in writing [its] reasons for sustaining the motion. However, prior law held that a general statement of reasons was adequate. The practice of allowing the reasons to be stated in general terms is retained, except that special findings of fact upon each element of the claim (cause of action) or defense is required and the supporting and opposing evidence must be related when a new trial is granted over the verdict of a nonadvisory jury found to be against the preponderance of the evidence. . . .

4 William F. Harvey, Indiana Practice Series: Rules of Procedure Annotated 61 (3d ed. 2003) (citations omitted). Thus, to satisfy Rule 59(J), the trial court's order that a new trial be granted on the basis of juror misconduct pursuant to Trial Rule 59(A)(1) need only state the general reasons for that judgment. There is no question that the court's order here met that burden.

Because the court's order satisfied Rule 59(J)'s requirement with respect to Rule 59(A)(1), we next review the trial court's judgment for an abuse of discretion. See Walker, 943 N.E.2d at 351; see also Henri v. Curto, 908 N.E.2d 196, 202 (Ind. 2009). An abuse of discretion occurs when the court's decision is against the logic and effect of the facts and circumstances before it, or if the court misinterprets the law. Fulp v. Gilliland, 998 N.E.2d 204, 210 (Ind. 2013).

The parties do not separately discuss Article 1, Section 13 of the Indiana Constitution and the Sixth Amendment to the United States Constitution, but it is clear that Clemons' challenge to Juror Number 289's conduct is under both of these provisions. As our Supreme Court has recently explained: "In such claims of juror misconduct under the Indiana Constitution, 'to warrant a new trial, there must be a showing that the misconduct was gross, and that it probably harmed the [moving party].'" Wilkes v. State,

17

984 N.E.2d 1236, 1250 (Ind. 2013) (quoting <u>Lopez v. State</u>, 527 N.E.2d 1119, 1130 (Ind.

1988)). Generally:

> proof that a juror was biased against the [moving party] or lied on voir dire entitles the [party] to a new trial. <u>McDaniel v. State</u> (1978), 268 Ind. 380, 375 N.E.2d 228, 232; <u>Berkman v. State</u> (1984), Ind. App., 459 N.E.2d 44, 45, <u>trans. denied</u>. A [party] seeking a hearing on juror misconduct must first present some specific, substantial evidence showing a juror was possibly biased. <u>Berkman</u>, 459 N.E.2d at 46.

<u>Lopez</u>, 527 N.E.2d at 1130. "[W]hen the [moving party] presents evidence that a juror

was possibly biased, and concealed this bias on voir dire, the trial court generally must

hold an evidentiary hearing to determine whether the juror was in fact biased." <u>Berkman</u>,

459 N.E.2d at 46 (citing, inter alia, <u>Barnes v. State</u>, 263 Ind. 320, 325-26, 330 N.E.2d

743, 747 (1975)).

To prevail under the federal standard, the moving party must "first demonstrate

that a juror failed to answer honestly a material question . . . and then further show that a

correct response would have provided a valid basis for a challenge for cause." <u>Wilkes</u>,

984 N.E.2d at 1250 (quotations omitted; omission original). The federal test "applies

equally to deliberate concealment and to innocent non-disclosure." <u>State v. Dye</u>, 784

N.E.2d 469, 473 (Ind. 2003). Regarding challenges for cause, Indiana Jury Rule 17(a)[4]

provides:

> In both civil and criminal cases the parties shall make all challenges for cause before the jury is sworn to try the case, or upon a showing of good cause for the delay, before the jury retires to deliberate. The court shall sustain a challenge for cause if the prospective juror:

---

[4] The parties dispute whether the trial court's judgment should be affirmed under Indiana Jury Rule 17(c), but it is clear that the trial court never considered that part of the Rule when it entered its judgment. Rather, the court's judgment is based exclusively on the potential bias or prejudice Juror Number 289 may have had toward Clemons. We limit our review accordingly.

> (1) is disqualified under rule 5;
>
> (2) served as a juror in that same county within the previous three hundred sixty-five (365) days in a case that resulted in a verdict;
>
> (3) will be unable to comprehend the evidence and the instructions of the court due to any reason including defective sight or hearing, or inadequate English language communication skills;
>
> (4) has formed or expressed an opinion about the outcome of the case, and is unable to set that opinion aside and render an impartial verdict based upon the law and the evidence;
>
> (5) was a member of a jury that previously considered the same dispute involving one or more of the same parties;
>
> (6) is related within the fifth degree to the parties, their attorneys, or any witness subpoenaed in the case;
>
> (7) has a personal interest in the result of the trial;
>
> (8) is biased or prejudiced for or against a party to the case; or
>
> (9) is a person who has been subpoenaed in good faith as a witness in the case.

(Emphasis added.)

Here, the trial court concluded that Juror Number 289 was biased or prejudiced against Clemons for two reasons. First, the court found that Juror Number 289 must have been biased or prejudiced against Clemons because the juror had been named as a civil defendant in a prior automobile-accident case, which was inconsistent with the juror's response on the juror questionnaire that he had never been a party to a civil lawsuit. Second, the court concluded that Juror Number 289 was biased or prejudiced against Clemons because, during voir dire, Clemons' counsel—unaware of the juror's participation in the earlier civil action—spoke favorably of the attorney who had represented the plaintiff in the juror's case.

We agree with the trial court that the juror's response on the juror questionnaire failed to disclose a material fact, which concealed a "potential source of bias against" Clemons. Appellant's App. at 18. And the juror's incorrect or false response deprived

19

the parties of an opportunity to inquire into any bias or prejudice the juror may have had.

Our Supreme Court discussed a similar situation in Barnes:

> [Indiana law] provides that: the following shall be good causes for challenge to any person called as a juror in any criminal trial:
>
> Eleventh. That he is biased or prejudiced for or against the defendant.
>
> Fourteenth. That he has a personal interest in the result of the trial.
>
> In response to the Motion to Correct Errors the State submitted affidavits which indicated that [the prosecutor's representative] was not aware at the time of trial of [a familial relationship to a juror]. It appears that the family of the juror's wife was quite large and the relationships among distant relatives tenuous. The prosecutor's representative stated he had not seen or heard from his second cousin in eleven years.
>
> Nevertheless, the possibility of bias existed. If the juror lied, his misconduct was ground for a new trial. If the answer was inaccurate, it prevented the defendant from investigating a possible source of future bias in favor of the prosecution. Even though the juror may not have been aware at the time of the voir dire question of his relationship, if at any time prior to the verdict he discovered such a fact[,] the possibility of bias existed. In such a situation the defendant would need to have the opportunity to probe the juror and, if he chose, to challenge for cause. Of course, if throughout the trial the juror never knew of the relationship there would be no error since the relationship could not have influenced his decision.

330 N.E.2d at 746-47 (quotations and citations omitted).

Thus, standing alone, the possibility of bias or prejudice is not enough to set aside a jury verdict. There may be a valid explanation for why the juror's response to the questionnaire was incorrect. For example, there is no dispute that the civil action against the juror occurred twelve years prior to the instant action and that the action against the juror was dismissed for failure to prosecute. And there is no evidence that Juror Number 289 had any recollection of having been sued; that he had any recollection of the attorney

20

who had represented the plaintiff in that action; or that he had any biases or prejudices against civil plaintiffs in general or against plaintiffs in car-accident cases in particular. Indeed, during voir dire Juror Number 289 stated that there are "absolutely" times when "lawsuits [are] appropriate," such as "[w]rongful death, wrongful injury, damage to property, things like that, I think, where clearly a law has been broken and the person bringing the lawsuit feels . . . that for whatever reason the extent of justice they've received so far isn't commensurate to what they feel they need." Transcript at 30-31. At the time, Clemons' counsel responded, "Very well put." Id. at 31.

Here, in light of the evidence presented by Clemons in his motion to correct error, the correct procedure for the trial court to follow was not to order a new trial based on juror misconduct but to order an evidentiary hearing. Again, "when [a party] presents evidence that a juror was possibly biased, and concealed this bias on voir dire, the trial court generally must hold an evidentiary hearing to determine whether the juror was in fact biased." Berkman, 459 N.E.2d at 46 (emphases added). In effect, the inquiry that should have occurred during voir dire must now occur in a post-trial evidentiary hearing. And, absent a finding that Juror Number 289 was in fact biased or prejudiced, there are no grounds to upset the jury verdict and order a new trial. See Barnes, 330 N.E.2d at 746-47. Thus, given the inadequate factual basis for a determination of juror misconduct, we reverse the trial court's order for a new trial under Trial Rule 59(A)(1) and remand with instructions for the court to hold an evidentiary hearing to determine whether Juror Number 289 was in fact biased or prejudiced against Clemons.

21

**Conclusion**

In sum, we agree with Diehl that the trial court's order vacating the jury verdict as inadequate and ordering a new trial fails to comply with the strict and paramount requirements of Trial Rule 59(J). The trial court's order fails to relate the opposing evidence on the question of Clemons' purported damages. See T.R. 59(J). Accordingly, the trial court's judgment on this issue is reversed and the jury verdict is reinstated. Walker, 943 N.E.2d at 352.

We also hold that the trial court abused its discretion when it ordered a new trial on the basis of juror misconduct. The evidence presented by Clemons demonstrates only the possibility of juror misconduct; it does not demonstrate that Juror Number 289 was in fact biased or prejudiced against Clemons. Accordingly, we reverse the trial court's judgment on this issue and remand for an evidentiary hearing consistent with this opinion. On remand, "the trial court should consider recusing itself since it has already determined that the juror was . . . biased." Dickenson v. State, 732 N.E.2d 238, 243 n.2 (Ind. Ct. App. 2000) (Vaidik, J., dissenting), trans. denied.

Reversed and remanded with instructions.

VAIDIK, C.J., and BROWN, J., concur.