FILED

Jan 31 2024, 8:30 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Joseph N. Williams
Williams & Piatt, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

David G. Field
Gaius G. Webb
Schultz & Pogue, LLP
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Amanda Ping,<br>*Appellant-Plaintiff*<br><br>v.<br><br>Margaret Inman, M.D.,<br>*Appellee-Defendant.* | January 31, 2024<br><br>Court of Appeals Case No.<br>23A-CT-251<br><br>Appeal from the Marion Superior<br>Court<br><br>The Honorable Kurt M. Eisgruber,<br>Judge<br><br>Trial Court Cause No.<br>49D06-2006-CT-20070 |

**Opinion by Judge Pyle**

Judges Vaidik and Tavitas concur.

**Pyle, Judge.**

## Statement of the Case

In this medical malpractice case, Amanda Ping ("Ping") appeals following a jury verdict in favor of Margaret Inman, M.D. ("Dr. Inman"). Ping challenges the trial court's denial of her motion to correct error based on juror misconduct. Ping argues that the trial court abused its discretion when it denied her request for a new trial or an evidentiary hearing on her juror misconduct claim. Concluding that the trial court abused its discretion when it denied her request for an evidentiary hearing, we reverse and remand with instructions to hold an evidentiary hearing on the issue of juror misconduct.

We reverse and remand with instructions.

## Issue

Whether the trial court abused its discretion when it denied Ping's motion to correct error based on juror misconduct.

## Facts

Ping was a patient of Dr. Inman, and Dr. Inman performed an exploratory laparoscopy on Ping. In 2017, Ping filed a proposed medical malpractice complaint with the Indiana Department of Insurance pursuant to the Indiana Medical Malpractice Act. In her complaint, Ping alleged that Dr. Inman had committed medical malpractice when Dr. Inman had sewn Ping's vaginal cuff to her bladder during her exploratory laparoscopy. In 2020, a medical review panel found no medical malpractice, and Ping filed her suit with the trial court.

[4] In November 2022, the trial court held a jury trial. Ping presented four experts to testify during her case. These experts were Aaron Ludwig, M.D. ("Dr. Ludwig"), Mark Kappelman, M.D. ("Dr. Kappelman"), Samuel Feinberg, M.D. ("Dr. Feinberg"), and Maret Cline, M.D. ("Dr. Cline"). Dr. Inman presented two experts to testify in her defense, Jocelyn Logan, M.D. ("Dr. Logan") and William Cheadle, M.D. ("Dr. Cheadle").

[5] During voir dire, the trial court read the names of the expert witnesses for both the plaintiff and the defendant. While reading the names, the following exchange occurred between Juror 11 ("Juror 11") and the trial court:

> THE COURT: . . . Does anyone recognize any of those names? You do? And that –
>
> [Juror 11]: Aaron Ludwig.
>
> THE COURT: You recognize?
>
> [Juror 11]: Dr. Aaron Ludwig.
>
> THE COURT: Dr. Aaron Ludwig. And I'm sorry, your name?
>
> [Juror 11]: [C.B.]
>
> THE COURT: [C.B.] Okay.
>
> [Juror 11]: And who was the first [name]? There was a third person after him, too?

THE COURT: There was another name you –

[Juror 11]: Yeah. Right after Dr. Aaron Ludwig?

THE COURT: Dr. Kappelman?

[Juror 11]: No.

THE COURT: Dr. Fineberg?

[Juror 11]: No.

THE COURT: Dr. Maret Cline?

[Juror 11]: Yes.

THE COURT: You know her too?

[Juror 11]: Know of her, yes.

(Tr. Vol. 2 at 17-18). Juror 11 did not acknowledge that she recognized Dr. Cheadle.

[6] Later during voir dire, the prospective jurors were asked about having any background in the medical field. Juror 11 explained that she worked as a medical device vendor. Juror 11 further explained that she worked closely with "nurses, physicians, mainly in breast surgery and breast oncology." (Tr. Vol. 2 at 25). After she disclosed this information, the following exchange occurred between Ping's counsel and Juror 11:

[Ping's Counsel]: Thank you. So I take it – do you actually go in and meet with doctors and nurses, [and] both sell and then also train them on how to use the equipment?

[Juror 11]: Correct.

[Ping's Counsel]: Okay. So I want to ask you the same question I asked the gentleman upfront, brutal honesty, knowing that when this case is over you've got your job to do, which is interact with all sorts of doctors and nurses. If the evidence supports a verdict against [Inman], what trouble would you have knowing that the folks you work with on a day-to-day, who may be medical professionals themselves, they ask you about your service in this case?

[Juror 11]: I don't think I would have an issue with it, it's whatever the information, and – that's presented, that's to be evaluated, and if it supports it, and my vote is in that favor or against I would stick to it.

(Tr. Vol. 2 at 25).

[7] Juror 11, along with five other jurors and an alternate, were selected by the parties, and the trial court gave preliminary instructions to the jury. During opening statements, Dr. Inman's counsel talked about Dr. Cheadle's upcoming testimony. Juror 11 did not mention her familiarity with Dr. Cheadle.

[8] When Ping's counsel called Dr. Cline as her first witness, the alternate juror ("Alternate Juror") recognized the expert witness and immediately notified the trial court. The trial court sent the jury out of the courtroom and questioned the Alternate Juror. During this questioning, the Alternate Juror revealed that her

"brain [had not been] fully with [her]" when the trial court had said Dr. Cline's name during voir dire. (Tr. Vol. 2 at 112). The Alternate Juror told the trial court that Dr. Cline had been one of her obstetrician/gynecologists during her pregnancy and that she had seen Dr. Cline two or three times. The trial court and the Alternate Juror had the following exchange:

> THE COURT: Would your experience with Dr. Cline impact your ability to be objective in this case?
>
> [Alternate Juror]: I don't think so.
>
> THE COURT: So, and you do understand that and experience you had with Dr. Cline is separate and distinct –
>
> [Alternate Juror]: Yeah.
>
> THE COURT: – from the events here? You understand that?
>
> [Alternate Juror]: Yes.

(Tr. Vol. 2 at 115). The trial court gave both Ping's and Dr. Inman's counsels the opportunity to question the Alternate Juror before sending her back to the jury room. Both Ping's and Dr. Inman's counsels allowed the Alternate Juror to remain on the jury as an alternate.

[9] During Ping's case-in-chief, Dr. Cheadle's name was mentioned multiple times during testimony. Later during the trial, Dr. Inman's counsel called Dr. Logan, who also mentioned Dr. Cheadle in her testimony. Finally, Dr. Inman's

counsel called Dr. Cheadle to the stand. Dr. Cheadle testified that he believed that Dr. Inman had met the standard of care during Ping's procedure. Juror 11 did not mention that she recognized Dr. Cheadle at any point during the trial.

[10] At the conclusion of the jury trial, the jury ruled in favor of Dr. Inman. The trial court allowed counsel for both sides to informally speak with the jury. Ping's attorneys, Dr. Inman's attorney, the trial court judge, the six jurors, and the Alternate Juror were present in this off-the-record meeting.

[11] There is no record of this meeting between the attorneys and the jurors. However, both of Ping's attorneys and Dr. Inman's attorney provided affidavits attesting to what had been said. During this post-trial meeting, Ping's attorney Joseph Williams ("Attorney Williams") alleged that Juror 11 had "volunteered that while Dr. Cheadle may be theatrical[,] she was familiar with him through her work and knew him to be credible." (App. Vol. 2 at 35). Ping's attorney Robert Johnson ("Attorney Johnson") alleged that Juror 11, when asked by the trial court about her opinion of the expert witnesses, had answered that "she found the testimony of Dr. []Cheadle to weigh more than the plaintiff's experts." (App. Vol. 2 at 37). Attorney Johnson also alleged that Juror 11 had stated that she "had heard of Dr. Cheadle from the University of Louisville before" but had "never had a chance to work with him or interact [with him]." (App. Vol. 2 at 37). Finally, Attorney Johnson alleged that Juror 11 had said that she had been "aware of Dr. Cheadle as a leading expert in the field of medicine during her work in hospitals." (App. Vol. 2 at 37). On the other hand, Dr. Inman's attorney David Field ("Attorney Field") alleged that Juror

11 "did not state that she knew Dr. Cheadle to be credible based on her familiarity with him through her work." (App. Vol. 2 at 46).

[12] After the off-the-record meeting, Ping's attorneys sent an email to the trial court and Attorney Field. In this email, Attorney Williams notified the parties that he was researching the juror misconduct issue. Thereafter, Ping filed a motion to correct error. In her motion, Ping argued that she was entitled to a new trial due to juror misconduct. Ping also argued that she was entitled to an evidentiary hearing to determine whether Juror 11 was biased. In support of her motion, Ping attached affidavits from Attorney Williams and Attorney Johnson that outlined the comments that Juror 11 had allegedly made during the off-the-record meeting. Dr. Inman filed a response in opposition to Ping's motion. Dr. Inman attached an affidavit from Attorney Field that challenged whether Juror 11 had stated that she found Dr. Cheadle to be more credible due to her familiarity with him through her work. The trial court denied Ping's motion to correct error without a hearing.

[13] Ping now appeals.

## Decision

[14] Ping argues that the trial court abused its discretion when it denied her motion to correct error based on juror misconduct. We review a trial court's judgment on a motion to correct error for an abuse of discretion. *Diehl v. Clemons*, 12 N.E.3d 285, 295-96 (Ind. Ct. App. 2014), *trans. denied*. An abuse of discretion

occurs when the court's decision is against the logic and effect of the facts and circumstances before it, or if the court misinterprets the law. *Id.* at 296.

[15] Ping challenges the trial court's denial of her motion to correct error requesting a new trial or an evidentiary hearing based on juror misconduct. Generally, "[p]roof that a juror was biased against the [moving party] or lied on voir dire entitles the [party] to a new trial." *McDaniels v. State*, 375 N.E.2d 228, 232 (Ind. Ct. App. 1978). "In such claims of juror misconduct under the Indiana Constitution, to warrant a new trial, there must be a showing that the misconduct was gross, and that it probably harmed the moving party." *Id.* at 296 (cleaned up).

[16] "A [party] seeking a hearing on juror misconduct must first present some specific, substantial evidence showing a juror was possibly biased." *Lopez v. State*, 527 N.E.2d 1119, 1130 (Ind. 1988) (citing *Berkman v. State*, 459 N.E.2d 44, 46 (Ind. Ct. App. 1984)). *See also Diehl*, 12 N.E.3d at 296; *Thompson v. Gerowitz*, 944 N.E.2d 1, 8 (Ind. Ct. App. 2011), *trans. denied*. "'[W]hen [the moving party] presents evidence that a juror was possibly biased, and concealed this bias on voir dire, the trial court generally must hold an evidentiary hearing to determine whether the juror was in fact biased.'" *Diehl*, 12 N.E.3d at 296 (quoting *Berkman*, 459 N.E.2d at 46).

[17] Here, our review of the record reveals that Juror 11 did not disclose her familiarity with Dr. Cheadle until after the jury had rendered its verdict. There

was no opportunity for Ping, Dr. Inman, or the trial court to probe into Juror 11's possible bias due to her familiarity with Dr. Cheadle.

[18] We find the facts before us to be similar to those of *Barnes v. State*, 330 N.E.2d 743 (Ind. 1975). In *Barnes*, a juror at trial was married to a second cousin to one of the prosecutor's staff who had been slightly involved in the trial. The juror did not disclose this relationship during voir dire. The prosecutor's staff member asserted that he had been unaware of the relationship at the time of trial and had not seen his cousin for eleven years. Our supreme court noted the following:

> Nevertheless, the possibility of bias existed. If the juror lied, his misconduct was ground for a new trial. If the answer was inaccurate, it prevented the defendant from investigating a possible source of future bias in favor of the prosecution. Even though the juror may not have been aware at the time of the voir dire question of his relationship, if at any time prior to the verdict he discovered such a fact; the possibility of bias existed. In such a situation the defendant would need to have the opportunity to probe the juror and, if he chose, to challenge for cause.

*Id.* at 747 (internal citation omitted). Ultimately, our supreme court remanded for an evidentiary hearing and instructed the trial court to question the juror about whether he was aware of his relationship to the prosecutor's staff during voir dire or any time before the jury's verdict. *Id.* If the answer to either of these questions was an affirmative, our supreme court instructed the trial court to order a new trial. *Id.*

[19]     Furthermore, in *Diehl*, which dealt with a trial to determine damages after a car accident, a juror did not disclose on a juror questionnaire that he had previously been a defendant in a case resulting from a vehicular collision. However, the case had occurred twelve years prior to his service as a juror and the case had been dismissed for a failure to prosecute. *Diehl*, 12 N.E.3d at 290. Also during voir dire, the plaintiff's attorney spoke favorably of the attorney who had represented the plaintiff in the juror's previous vehicle collision case. *Id.* at 292. Further, during voir dire, the juror stated that:

> there are absolutely times when lawsuits are appropriate such as wrongful death, wrongful injury, damage to property, things like that, I think, where clearly a law has been broken and the person bringing the lawsuit feels that for whatever reason the extent of justice they've received so far isn't commensurate to what they feel they need.

*Id.* (cleaned up). We held that "standing alone, the possibility of bias or prejudice is not enough to set aside a jury verdict." *Id.* at 297. But, we remanded the case back to the trial court and ordered the trial court to hold an evidentiary hearing to determine whether the juror was biased or prejudiced. *Id.* at 298.

[20]     Here, the facts before us are similar to those of *Barnes* and *Diehl*. Our review of the record reveals that Juror 11 did not disclose during voir dire or the entirety of the trial that she knew Dr. Cheadle. After the jury entered a verdict in favor of Dr. Inman, Juror 11 disclosed that she had been familiar with Dr. Cheadle through her work but had never interacted with or worked with him. Further,

Juror 11 disclosed that "she found the testimony of Dr. []Cheadle to weigh more than the plaintiff's experts." (App. Vol. 2 at 37). Juror 11's statements are the kind of "specific, substantial evidence" of possible bias that merit an evidentiary hearing. *Lopez*, 527 N.E.2d at 1130. *See also Barnes*, 330 N.E.2d at 747 (holding that a juror who did not disclose that he was a second cousin to a prosecutor's staff required an evidentiary hearing to determine if the juror was aware of his relationship to the prosecutor's staff); *see also Diehl*, 12 N.E.3d at 298 (holding that a juror in a vehicle collision damages case who had been a defendant in a vehicle collision case twelve years prior to his service as a juror required an evidentiary hearing to determine bias or prejudice).

[21] Because the record shows that there was a possibility of juror bias, the trial court should have held an evidentiary hearing. *See Lopez*, 527 N.E.2d at 1130. At the evidentiary hearing, the trial court can determine the extent of Juror 11's knowledge of Dr. Cheadle and if it interfered with her ability to render a verdict solely on the evidence presented at trial. Much like we had previously held in Diehl, "the inquiry that should have occurred during voir dire must now occur in a post-trial evidentiary hearing." *Diehl*, 12 N.E.3d at 298. Accordingly, we remand to the trial court with instructions to hold an evidentiary hearing to determine whether Juror 11 was actually biased or prejudiced against Ping due to her familiarity with Dr. Cheadle through her work as a medical device vendor.

Reversed and remanded with instructions.

Vaidik, J., and Tavitas, J., concur.