

**FILED**

Aug 26 2015, 8:57 am

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

J. Kevin King
Peter Campbell King
Cline, King & King, P.C.
Columbus, Indiana

ATTORNEYS FOR APPELLEES

Marc T. Quigley
Libby Y. Goodknight
Catherine E. Sabatine
Krieg DeVault LLP
Indianapolis, Indiana

Edward F. Harney, Jr.
William D. Beyers
Hume Smith Geddes Green & Simmons,
LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Lydia Lanni, | August 26, 2015 |
| *Appellant-Plaintiff,* | Court of Appeals Case No. 49A02-1409-CT-649 |
| v. | |
| | Appeal from the Marion Superior Court |
| National Collegiate Athletic Association, University of Notre Dame Du Lac, and United States Fencing Association, Inc., | The Honorable Michael D. Keele, Judge |
| *Appellees-Defendants.* | Cause No. 49D07-1202-CT-5179 |

**Najam, Judge.**

# Statement of the Case

Lydia Lanni appeals from the trial court's entry of summary judgment for the National Collegiate Athletic Association ("NCAA") and the United States Fencing Association, Inc. ("USFA"). In her complaint, Lanni alleged that the NCAA and the USFA sponsored a fencing competition at the University of Notre Dame ("Notre Dame")[1] in South Bend, which Lanni attended as a student-athlete and at which she suffered a serious eye injury while standing near one of the competitions. She further alleged that her injury resulted from negligence on the part of the NCAA, the USFA, and Notre Dame.

We address the following issues in this appeal:

1. Whether the NCAA owed Lanni a duty of care.

2. Whether the USFA owes a duty of care to those who participate in fencing matches that are played under the USFA's rules and that are refereed by USFA-trained referees.

3. Whether the trial court erred when the court denied Lanni's motion for a change of judge on remand from this court following our reversal of an earlier entry of summary judgment.

---

[1] Notre Dame is also a named defendant in Lanni's action; Lanni's claims against Notre Dame remain pending in the trial court.

[3] We affirm the court's entry of summary judgment.[2]

## Facts and Procedural History[3]

[4] The NCAA is an organization that oversees intercollegiate athletic competitions involving the student-athletes of its member institutions, and Notre Dame is an NCAA member institution. Pursuant to the NCAA's constitution, NCAA competition rules "shall apply to all teams in sports recognized by the member institutions as varsity intercollegiate sports . . . ." Appellant's App. at 308. The NCAA constitution further provides that "[i]t is the responsibility of each member institution to protect the health of and provide a safe environment for each of its participating student-athletes." *Id.* at 302. But, according to the NCAA's website:

> The NCAA takes appropriate steps to modify safety guidelines, playing rules[,] and standards to minimize those risks and provide student[-]athletes with the best opportunity to enjoy a healthy career. The injury surveillance program collects, analyzes, interprets[,] and disseminates data on injuries in each sport, providing a wealth of information through which we can provide athletes with a safe[,] competitive environment.

---

[2] We held oral argument on July 27, 2015, in the Indiana Supreme Court courtroom.

[3] Throughout its brief on appeal the NCAA complains about Lanni's assessment of the facts, saying they "are riddled with argument, mischaracterizations, and misleading inferences." Appellee NCAA's Br. at 14. This court is capable of "separating the wheat from the chaff inserted by both parties in their briefs." *Oxford Fin. Group, Ltd. v. Evans*, 795 N.E.2d 1135, 1139 (Ind. Ct. App. 2003).

*Id.* at 100 (quoting the NCAA's website). And Eric Breece, the NCAA's Coordinator of Championships and Alliances since 2012, stated, while testifying on behalf of the NCAA, that "any serious injury" at an NCAA event "is unacceptable if reasonable safety measures could prevent" the injury. *Id.* at 249.

[5] The NCAA has established a Fencing Committee, which promulgates rules for the sport to member institutions. *Id.* at 250. If the Fencing Committee wished to alter or amend those rules, the Fencing Committee would first send the proposed revision to the NCAA's Playing Rules Oversight Panel for review. *Id.* If an injury were to occur at an NCAA fencing competition, that injury would be reported to the NCAA Committee on Competitive Safeguards and Medical Aspects of Sports ("CSMAS"), which, in turn, would "probably share" that information with the Fencing Committee. *Id.* at 253.

[6] According to the NCAA's "Fencing Meet Procedures":

> member institutions shall conduct all of their intercollegiate competition[s] in accordance with the playing rules of the [NCAA] in all sports for which the NCAA develops playing rules. For those sports in which the [NCAA] follows rules that are developed by other governing bodies and modified by the governing sports committee, the adopted playing rules shall be used. . . .

*Id.* at 875. The Fencing Meet Procedures then state that the rules of the USFA "will be the applicable rules for intercollegiate competitions." *Id.* The USFA is "the official governing body for amateur fencing activities in the United States[]

and is so recognized by the United States Olympic Committee and the International Fencing Federation." *Id.* at 966. The USFA's "rules for fencing . . . apply to all USFA championships and nationally-rated competitions . . . ." *Id.* After stating that the USFA's rules apply to NCAA events, the NCAA's Fencing Meet Procedures then list numerous "Rules In Addition To USFA Rules." *Id.* at 875.

[7] The USFA's rules, adopted by the NCAA, include a diagram of a fencing area. In particular, this diagram demonstrates a border around every four fencing strips. *Id.* at 880. According to Robert Dilworth, the Executive Director of the USFA in March of 2010, this border "[u]sually . . . represents a series of pipes that delineate where spectators may and may not go." *Id.* at 912. At least through 2013 for the NCAA, *id.* at 257-58, but only through sometime in 2010 for the USFA, *id.* at 912, the border also included hanging drapes. The NCAA, like the USFA, required the pipe-and-drape barrier at least in part because the barrier "provides space around the strip so that only the fencer[s] and the referee are in [the fencing] area." Appellant's App. at 258.

[8] As part of his responsibilities with the NCAA, Breece worked as a staff liaison to the Fencing Committee, and he assisted that committee with, among other things, running the NCAA Fencing Championships. *Id.* at 246. Part of that responsibility, in turn, included "site inspection . . . walk through[s]" to "make sure the facility was set up the way . . . that [the NCAA had] instructed the host [member institution] to set it up." *Id.* at 257. This inspection included verifying the placement of the pipe-and-drape barrier. *Id.* at 257-58.

[9]     On March 7, 2010, Lanni attended a fencing competition at Notre Dame ("the March 2010 competition"). A "Visiting Team/Club Guide" ("the Guide") published by Notre Dame for the event described the competition as "the Midwest Fencing Conference Championship." *Id.* at 241. The cover page for the Guide displayed Notre Dame's school logo and mascot; the logo for the Midwest Fencing Conference; and the logo for the NCAA. *Id.*

[10]    The Midwest Fencing Conference is not an NCAA-affiliated conference. *Id.* at 250-51. However, "[a]ll colleges and universities in the NCAA Midwest Region," such as Notre Dame, "[that] sponsor a varsity or club intercollegiate fencing team" are eligible for membership in the Midwest Fencing Conference. *Id.* at 189. The Midwest Fencing Conference further requires "[a]ll matches hosted by Conference members [to] be conducted pursuant to USFA Rules, as modified by the NCAA . . . ." *Id.* at 210.

[11]    The March 2010 competition occurred the weekend before the start of the official NCAA Fencing Regional Championships, which lead into the NCAA Fencing National Championship. *Id.* at 1065. To be eligible to compete in the NCAA Regional Championships, a fencer must have previously competed "in a minimum of 18 bouts against varsity teams of four-year, degree-granting institutions" and also have "[a]chieved a 20 percent win-loss record in scheduled dual meets in the same weapon against varsity teams of four-year, degree-granting institutions." *Id.* In determining eligibility for the NCAA Regional Championships, the Fencing Committee "will not consider any

results for selection purposes that are not played in accordance with NCAA rules . . . ." *Id.* at 1072.

[12] Dilworth testified on behalf of the USFA that the referees at the March 2010 competition were USFA-trained referees. In particular, Dilworth stated that the referees at the March 2010 competition "were trained to work at USFA competitions by the USFA." *Id.* at 920. However, there is no designated evidence to suggest that the USFA sponsored or knew of the March 2010 competition.

[13] The referees at the March 2010 competition kept scores on scoresheets that were marked with the NCAA logo. *E.g.*, *id.* at 229. Competition rosters also carried the logo of the NCAA Fencing Committee. *Id.* at 240. The Northwestern University fencing team was a participant in the March 2010 competition; Laurence Schiller, the team's head coach, was likewise at that competition. *Id.* at 143. Schiller is also a member of the NCAA Fencing Committee. *Id.* at 1065.

[14] Lanni was a student-athlete at Wayne State University and a participant in the March 2010 competition.[4] *Id.* at 240. After one of her fencing bouts had ended, she stood in a "designated waiting area[]" that was "next to the fencing strip" where "[a] new bout between two different girls had started." *Id.* at 77. While

---

[4] The parties debate whether Lanni was a student-athlete or a mere spectator. Lanni's designated evidence plainly shows that she was a student-athlete participating in the March 2010 competition, although, at the time of her injury, she was not actively engaged in a bout.

standing in the designated area near the bout, "one of the [fencer's] sabres struck" Lanni "across the face in a diagonal manner, across the bridge of [her] nose," and resulted in a severe injury to Lanni's left eye. *Id.*

[15] Shortly after the accident that resulted in Lanni's injury, in May of 2010 the Fencing Committee "discussed the layout" at fencing competitions and "expressed concern that the strips were too close together and too close to the scoring system." *Id.* at 882. The Committee "suggested that[,] whenever possible, . . . we limit spectators from walking between the corrals. Spectators could be allowed on the competition floor around the perimeter of the corrals[] but not allowed between the corrals." *Id.* When asked if he knew "who brought that to the attention of the Fencing Committee" or "why it was brought to the attention of the Fencing Committee," Breece testified that he did not know. *Id.* at 258-59.

[16] On February 8, 2012, Lanni filed her complaint against the NCAA, the USFA, and Notre Dame. In particular, Lanni alleged that the NCAA had acted negligently as follows:

> 2. Defendant NCAA acting through its agents, including, but not limited to[,] the NCAA Men's and Women's Fencing Committee and regional advisory committees, were responsible, in part or total, for the operations of the Midwest Regional Fencing Competition[5] at the time [Lanni] was injured.

---

[5] The complaint misstates the title of the Midwest Fencing Championships.

3.      On or before March 7, 2010, Defendant NCAA was negligent . . . by failing to undertake hazard and risk analys[e]s prior to the commencement of the Midwest Regional Fencing Competition to insure adequate safety of spectators watching an event.

4.      On or before March 7, 2010, Defendant NCAA was negligent . . . by failing to select and/or supervise qualified officials for the Midwest Regional Fencing Competition.

5.      On March 7, 2010, Defendant NCAA was negligent . . . by failing to supervise the Midwest Regional Fencing Competition to insure hazards and risks were consistently monitored to prevent [Lanni's] injuries.

*Id.* at 25-26. Lanni also alleged negligence on the part of the USFA and Notre Dame.

[17]     On April 3, the NCAA moved to dismiss the complaint and/or enter summary judgment for the NCAA. Attached to the NCAA's motion was the affidavit of Kelly Whitaker Shaul, the Championships Manager for the sport of fencing at the NCAA. According to Shaul's affidavit:

6.      The NCAA did not have any involvement in any fencing competition that may have occurred on March 7, 2010, including any fencing competition at Notre Dame. To the extent a fencing competition was held at Notre Dame on March 7, 2010, the NCAA did not sanction any such event. The NCAA did not participate in any such event. The NCAA did not supervise any such event. The NCAA did not select the officials for any such event. The NCAA had no other involvement with any such event.

* * *

10. If a school, group of schools[,] or conference put on competitions prior to the NCAA's Regional fencing competitions, the NCAA would have no involvement with such competitions.

*Id.* at 39-40.

[18] On July 9, while discovery was ongoing, the trial court granted the NCAA's request for summary judgment. Lanni appealed, and we held that the trial court erred when it entered summary judgment "without awarding Lanni a reasonable opportunity to present relevant materials in opposition to the motion for summary judgment." *Lanni v. NCAA*, 989 N.E.2d 791, 799 (Ind. Ct. App. 2013) (*Lanni I*). Accordingly, we remanded for further proceedings. *Id.*

[19] Our opinion in *Lanni I* was certified as final on July 10, 2013. The next day, Lanni moved for a change of judge pursuant to Indiana Trial Rule 76(C)(3) (the July 11 Motion). The court denied the July 11 Motion. Thereafter, the USFA filed its motion for summary judgment.

[20] The trial court held a hearing on the motions for summary judgment. After the hearing, the court granted summary judgment to the NCAA and the USFA. This appeal ensued.

# Discussion and Decision

## *Issue One:  Summary Judgment for the NCAA*

### *Overview*

We first address Lanni's challenge to the trial court's entry of summary judgment for the NCAA.  Our supreme court has stated our standard of review as follows:

> We review summary judgment de novo, applying the same standard as the trial court:  "Drawing all reasonable inferences in favor of . . . the non-moving parties, summary judgment is appropriate 'if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Williams v. Tharp*, 914 N.E.2d 756, 761 (Ind. 2009) (quoting T.R. 56(C)).  "A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences."  *Id.* (internal citations omitted).

> The initial burden is on the summary-judgment movant to "demonstrate [ ] the absence of any genuine issue of fact as to a determinative issue," at which point the burden shifts to the non-movant to "come forward with contrary evidence" showing an issue for the trier of fact.  *Id.* at 761-62 (internal quotation marks and substitution omitted).  And "[a]lthough the non-moving party has the burden on appeal of persuading us that the grant of summary judgment was erroneous, we carefully assess the trial court's decision to ensure that he was not improperly denied his day in court."  *McSwane v. Bloomington Hosp. & Healthcare Sys.*, 916 N.E.2d 906, 909-10 (Ind. 2009) (internal quotation marks omitted).

*Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014) (alterations original to *Hughley*).

[22]     Summary judgment is a "high bar" for the moving party to clear in Indiana. *Id.* at 1004. "In particular, while federal practice permits the moving party to merely show that the party carrying the burden of proof [at trial] lacks evidence on a necessary element, we impose a more onerous burden: to affirmatively 'negate an opponent's claim.'" *Id.* at 1003 (quoting *Jarboe v. Landmark Cmty. Newspapers of Ind., Inc.*, 644 N.E.2d 118, 123 (Ind. 1994)). Further:

> Summary judgment is a desirable tool to allow the trial court to dispose of cases where only legal issues exist. But it is also a "blunt . . . instrument" by which the non-prevailing party is prevented from having his day in court. We have therefore cautioned that summary judgment is not a summary trial and the Court of Appeals has often rightly observed that it is not appropriate merely because the non-movant appears unlikely to prevail at trial. In essence, Indiana consciously errs on the side of letting marginal cases proceed to trial on the merits, rather than risk short-circuiting meritorious claims.

*Id.* at 1003-04 (citations and some quotations omitted; omission original to *Hughley*). Thus, for the trial court to properly grant summary judgment, the movants must have made a prima facie showing that their designated evidence negated an element of the nonmovant's claims, and, in response, the nonmovant must have failed to designate evidence to establish a genuine issue of material fact. *See Dreaded, Inc. v. St. Paul Guardian Ins. Co.*, 904 N.E.2d 1267, 1270 (Ind. 2009).

[23]  The elements of a negligence claim are well known to this court. As we have stated, "[t]o recover on a negligence claim, a plaintiff must establish three elements: (1) a duty owed to the plaintiff by the defendant; (2) a breach of that duty; and (3) injury to the plaintiff resulting from the defendant's breach." *Rodriguez v. U.S. Steel Corp.*, 24 N.E.3d 474, 477 (Ind. Ct. App. 2014), *trans. denied*. "Summary judgment is rarely appropriate in negligence cases because they are particularly fact-sensitive and are governed by a standard of the objective reasonable person, which is best applied by a jury after hearing all the evidence." *Kramer v. Catholic Charities of Diocese of Ft. Wayne-S. Bend, Inc.*, 32 N.E.3d 227, 231 (Ind. 2015).

[24]  The trial court's summary judgment for the NCAA turns on the element of duty. As such, we address the two theories of duty that Lanni attempts to invoke against the NCAA: whether the NCAA owed her a general duty of care under the factors articulated by the Indiana Supreme Court in *Webb v. Jarvis*, 575 N.E.2d 992, 997 (Ind. 1991), and whether there is a genuine question of material fact regarding whether the NCAA assumed a duty of care over Lanni and other student-athletes.[6]

---

[6] The parties raise numerous side-arguments on appeal. We assume for the sake of argument that Lanni's summary judgment designations were timely filed and that the NCAA had clear notice from Lanni's complaint of her theories of liability against it. Likewise, we reject Lanni's argument on appeal that the NCAA did not preserve these arguments for our review because it did not present them in its initial brief in support of its motion for summary judgment. Aside from our de novo review on appeal, Lanni's complaint, the NCAA's brief in support of its motion for summary judgment, and Lanni's response to the NCAA's motion all put the other parties on fair notice as to what the theories alleged were. We also need not discuss the NCAA's alternative argument that it had no duty to Lanni because Notre Dame had no duty to her.

[25]     Under *Webb*:

> Whether the law recognizes any obligation on the part of a particular defendant to conform his conduct to a certain standard for the benefit of the plaintiff is a question of law. . . . [T]hree factors must be balanced, *viz.* (1) the relationship between the parties, (2) the reasonable foreseeability of harm to the person injured, and (3) public policy concerns.

575 N.E.2d at 995. This analysis is a question of law. *Kramer*, 32 N.E.2d at 233.

[26]     We believe the Indiana Supreme Court's recent analysis in *Yost v. Wabash College*, 3 N.E.3d 509 (Ind. 2014), is controlling here. In *Yost*, a pledge at a local chapter of Phi Kappa Psi alleged he was injured in a hazing incident, and he sued the local chapter as well as the national fraternity. In considering whether the national fraternity owed the pledge a duty as a matter of law under *Webb*, our supreme court stated:

> Of these three factors, the parties' relationship and public policy concerns undermine Yost's claim of duty on the part of the national fraternity under the designated facts most favorable to Yost. The national fraternity lacked any direct oversight and control of the individual fraternity members. *It did not have any employees present in the fraternity house, and the day-to-day management of the house was the responsibility of the local fraternity, not the national fraternity. Despite the national fraternity's efforts to establish aspirational objectives and to promote their fulfillment, the relationship between the national fraternity and the individual student members was remote and tenuous.* Public policy concerns likewise

do not favor recognition of a specific duty of care toward Yost by the national fraternity. As we noted above with respect to Wabash [College], *the national organization*—with which local fraternities and sororities affiliate—*should be encouraged, not disincentivized, to undertake programs to promote safe and positive behavior* and to discourage hazing and other personally and socially undesirable conduct. In sum, we conclude that the national fraternity had no general duty to Yost upon which this negligence action may be based.

*Id.* at 521 (emphases added).

[27] Simply, we see no daylight between our supreme court's analysis in *Yost* with respect to the relationship between a national fraternity and a student engaged with a local chapter and the relationship between the NCAA and a student-athlete participating at an event on the campus of a member institution. And, under Indiana law, where the case law analysis of a general duty under *Webb* involves facts and circumstances that are substantially similar to the instant case, then the holding of the case law controls and we will not revisit the *Webb* balancing test. *See id.* at 515*; see also Goodwin v. Yeakle's Sports Bar & Grill, Inc.*, 28 N.E.3d 310, 311 (Ind. Ct. App. 2015), *not yet certified*. As we hold that *Yost* controls here, we need not revisit the *Webb* analysis our supreme court undertook in *Yost*, and we hold, as a matter of law, that the NCAA did not owe Lanni a general duty of care.

[28]     Lanni also alleges that the NCAA has gratuitously assumed a duty of care over its student-athletes.[7] We consider this question in light of the facts most favorable to Lanni as the summary judgment nonmovant. *E.g.*, *Yost*, 3 N.E.3d at 517. Again, we believe recent supreme court analyses, including that in *Yost*, forecloses Lanni from reliance on this theory of liability.

[29]     In discussing whether the national fraternity had assumed a duty of care over local chapter pledges in *Yost*, our supreme court stated:

> "A duty of care may . . . arise where one party assumes such a duty, either gratuitously or voluntarily. The assumption of such a duty creates a special relationship between the parties and a corresponding duty to act in the manner of a reasonably prudent person." The assumption of such a duty requires affirmative, deliberate conduct such that it is "apparent that the actor . . . specifically [undertook] to perform the task that he is charged with having performed negligently, 'for without the actual assumption of the undertaking there can be no correlative legal duty to perform that undertaking carefully.'" Where "the record contains insufficient evidence to establish such a duty, the court will decide the issue as a matter of law." The liability for the breach of assumed duty is expressed in the Restatement (Third) of Torts: Physical and Emotional Harm § 42 (2012), which states:

---

[7] We assume for the sake of argument that Lanni's designations demonstrate a genuine issue of material fact with respect to whether the March 2010 competition was an NCAA-sponsored event. But there is no dispute that the event was on the campus of Notre Dame, rather than at a neutral or nonmember-institution location, and that Notre Dame, rather than the NCAA, set up the event. We need not consider whether our holding regarding the NCAA's alleged assumption of a duty would apply in other circumstances.

> An actor who undertakes to render services to another and who knows or should know that the services will reduce the risk of physical harm to the other has a duty of reasonable care to the other in conducting the undertaking if:
>
> (a) the failure to exercise such care increases the risk of harm beyond that which existed without the undertaking, or
>
> (b) the person to whom the services are rendered or another relies on the actor's exercising reasonable care in the undertaking.
>
> Thus, to impose liability resulting from breach of assumed duty, it is essential to identify and focus on the specific services undertaken. Liability attaches only for the failure to exercise reasonable care in conducting the "undertaking."

*Id.*

In *Yost*, our supreme court held that the national fraternity did not assume a duty to protect local pledges from hazing. In particular, the court concluded that, although there was "evidence that the national fraternity engaged in educational outreach programs to enhance proper behavior and to discourage hazing[,] . . . the specific undertaking did not extend to *actual oversight and control* over the behavior of individual student members of the local fraternity." *Id.* at 521 (emphasis added).

Shortly after *Yost*, the Indiana Supreme Court considered a similar case with similar issues. In *Smith v. Delta Tau Delta*, 9 N.E.3d 154 (Ind. 2014), a pledge at

a local chapter of Delta Tau Delta died of acute alcohol ingestion, and his family sued, in relevant part, the local fraternity and the national fraternity. In considering whether the national fraternity had assumed a duty of care to protect local pledges from alcohol-related death, our supreme court considered numerous facts favorable to the summary judgment nonmovants:

- The local fraternity "was an Indiana self-governing, unincorporated association of undergraduate students."

- The national fraternity's constitution, bylaws, and Membership Responsibility Guidelines ("MRGs") show its disapproval of hazing and irresponsible and underage drinking.

- The national fraternity provided an online alcohol education program for all new local chapter members, to help them understand the "individual health problems, learning problems . . . relationship problems . . . and legal problems" associated with alcohol consumption.

- The national fraternity required all pledges to complete the program within the first semester of their pledgeship.

- The national fraternity recommended that local chapters have a house risk manager—a trained officer of the house who can help respond to emergency situations—who is elected by the local fraternity without the approval of the national fraternity. Like all elected officials in a local fraternity, the national fraternity provided educational materials to the house risk manager to assist him in his duties for the local chapter.

- The national fraternity's authority for enforcing its guidelines and policies on hazing and alcohol consumption allowed it to suspend charters, discipline or expel individual members, or even require "[a]dditional educational programming," with decisions to sanction charters or individuals subject to appeal.

- Each local chapter had a chapter advisor appointed by the national fraternity's Division President and subject to the approval of the Arch Chapter, which is the "executive body of the [national fraternity]" and is composed of eleven individual members.

- The advisor's duties included being "deputy of the Arch Chapter" and a "custodian of the [local fraternity's] charter, secret books, files, official documents, and Ritual." He was tasked with complying with all requests and orders of the Division President.

- Local chapters were responsible for electing a treasurer to maintain the local chapter's financial records and bookkeeping. Once per month, a local chapter would certify to the national fraternity that the record keeping is correct and accurate, especially in regard to accounts receivable. And, generally once per semester, a chapter consultant would check the account information and record keeping with the treasurer to promote accuracy and ensure the books were up to date.

- The national fraternity reserved the right to discipline local chapters and individuals for violations of its policies, including the suspension of an individual's membership and the withdrawal of a local chapter's charter.

- The local chapter advisor, Doug Coy, was at the local fraternity the day before the incident and the morning of the incident helping the local fraternity to prepare for the house's homecoming dedication.

- It was the duty of the chapter advisor to "see that the Guidelines are upheld, and equally importantly, that the spirit of the Guidelines is met."

- Coy had previously reported prior alleged violations of the MRGs, which had resulted in a chapter consultant talking with the local fraternity after Coy and correcting the noncompliance.

- Coy "felt like [he] had a duty to take action" when acting as chapter advisor if he observed anything that could be considered hazing or underage drinking.

- Coy was responsible for attending at least one chapter meeting per month, for ensuring the alcohol education program was timely completed by the local fraternity members, and for reporting any violation of MRGs of which he became aware to the national fraternity.

*Id.* at 161-63.

[32] Our supreme court summarized the facts of the *Smith* case as "more robust and extensive than those described in" *Yost* and other cases but "not different in nature or character." *Id.* at 163. Hence, the court held:

the national fraternity's involvement with the local fraternity . . . fails to establish any significant difference in the nature of the specific services undertaken—providing information to the local fraternity to discourage hazing and alcohol abuse and disciplining chapters and members for violations. There is no

evidence that the national fraternity assumed any duty of preventative, direct supervision and control of the behaviors of its local chapter members. While it certainly was the commendable objective of the national fraternity to actively engage in programs to discourage hazing and alcohol abuse, we find that the specific services assumed by the national fraternity did not rise to the level of assuring protection of the freshman pledges from hazing and the dangers of excessive alcohol consumption—the assumed duty alleged by the plaintiffs. The national fraternity did have a duty of reasonable care in the performance of its assumed duty of providing information and guidance. But the national fraternity's conduct did not demonstrate any assumption of a duty directly to supervise and control the actions of the local fraternity and its members. The national fraternity did not have a duty to insure the safety of the freshman pledges at the local fraternity.

*Id.*

[33] Here, the facts most favorable to Lanni demonstrate the following:

- The March 2010 competition occurred on the campus of Notre Dame, an NCAA member institution, and in accordance with the NCAA's rules for the sport of fencing. Appellant's App. at 875.

- Laurence Schiller, a member of the Fencing Committee and the head coach of the participating Northwestern University team, was present at the competition. *Id.* at 143, 1065.

- The competition occurred one week before the start of the NCAA Fencing Regional Championships, and to be eligible for the regional championships fencers were required to have, among other things, a

minimum of eighteen bouts "played in accordance with NCAA rules."
*Id.* at 1065, 1072.

- The NCAA's website states that the NCAA "takes appropriate steps to modify safety guidelines, playing rules[,] and standards to minimize those risks and provide student[-]athletes with the best opportunity to enjoy a healthy career." *Id.* at 100.

- The USFA rules, adopted by the NCAA, define a fencing area to include a "Removable Area," which "usually represents a series of pipes that delineate where spectators may and may not go." *Id.* at 880, 912.

- Breece, on behalf of the NCAA, agreed that the pipe-and-drape barrier "provides space around the [fencing] strip so that only the fencer[s] and the referee are in [the fencing] area." *Id.* at 258.

- Breece's responsibilities included site inspections to ensure compliance by the member institution with NCAA mandates, and his site inspections including verifying the placement of the pipe-and-drape barrier. *Id.* at 257-58.

- The NCAA "collects, analyzes, interprets[,] and disseminates data on injuries in each sport" in order to "provide athletes with a safe[,] competitive environment." *Id.* at 100.

- If an injury were to occur at an NCAA fencing competition, that injury would be reported to the CSMAS, which, in turn, would share that information with the Fencing Committee. *Id.* at 253.

- Shortly after Lanni's injury, in May of 2010 the Fencing Committee "discussed the layout" at fencing competitions, "expressed concern that the [fencing] strips were too close together," and "suggested that[,] whenever possible, . . . we limit spectators from walking between the corrals." *Id.* at 882.

[34] We conclude that the NCAA's regulation of the field of play and other rules and policies with respect to safety issues are identical in their nature and character to the national fraternities' guidance to their local chapters in *Yost* and *Smith*. Just as in *Yost* and *Smith*, the specific duties undertaken by the NCAA with respect to the safety of its student-athletes was simply to provide information and guidance to the NCAA's member institutions and student-athletes. And Breece's compliance checks are identical in their nature and character to Coy's compliance checks with the local chapter in *Smith*. It is commendable for the NCAA to actively engage its member institutions and student-athletes in how to avoid unsafe practices, but those acts do not rise to the level of assuring protection of the student-athletes from injuries that may occur at sporting events. Actual oversight and control cannot be imputed merely from the fact that the NCAA has promulgated rules and regulations and required compliance with those rules and regulations. The NCAA's conduct does not demonstrate that it undertook or assumed a duty to actually oversee or directly supervise the actions of the member institutions and the NCAA's student-athletes. *See Smith*, 9 N.E.3d at 163. Accordingly, as Lanni cannot

demonstrate the element of duty required for her negligence claim against the NCAA, we affirm the trial court's entry of summary judgment for the NCAA.

### *Issue Two: Summary Judgment for the USFA*

[35] Lanni also appeals the trial court's entry of summary judgment for the USFA. Specifically, Lanni asserts that the USFA assumed a duty to protect Lanni from injury because the March 2010 competition was played at least in part under USFA rules and with USFA-trained referees. But there is no dispute that the March 2010 competition was not a USFA-sponsored event, and there is no evidence to show even that the USFA had knowledge of the March 2010 competition. Thus, if the NCAA did not owe Lanni a duty, neither did the USFA, whose relationship to Lanni was even more remote than the NCAA's and whose control over the March 2010 competition was even more tenuous. As such, we affirm the court's entry of summary judgment for the USFA.

### *Issue Three: Change of Judge Motion*

[36] Finally, we address Lanni's argument that the trial court erred when it denied the July 11 Motion for change of judge. Lanni's argument on this issue requires this court to interpret our trial rules. "Because construction of the trial rules is a question of law, we review this issue de novo." *Higgason v. State*, 789 N.E.2d 22, 27 (Ind. Ct. App. 2003).

[37] Indiana Trial Rule 76 provides as follows:

> (C)  In any action except criminal no change of judge or change of venue from the county shall be granted except within the time

herein provided. Any such application for change of judge (or change of venue) shall be filed not later than ten [10] days after the issues are first closed on the merits. Except:

* * *

(3) if the trial court or a court on appeal orders a new trial, or if a court on appeal otherwise remands a case *such that a further hearing and receipt of evidence are required to reconsider all or some of the issues heard during the earlier trial*, the parties thereto shall have ten [10] days from the date the order of the trial court is entered or the order of the court on appeal is certified . . . .

(Emphasis added.) Lanni asserts that our reversal in *Lanni I* of the trial court's original entry of summary judgment and order on remand that the court allow Lanni time to present evidence in response to the summary judgment motions satisfies Rule 76(C)(3).

[38] Lanni argues that a "trial" under Rule 76(C)(3) includes a summary judgment. This of course is not the traditional concept either of a trial or of a summary judgment; the whole point of summary judgment is to end cases where there is no "triable issue." *Williams*, 914 N.E.2d at 761-62. And the risk that accompanies an incorrect entry of summary judgment is the risk of "short-circuiting meritorious claims" from a "trial on the merits." *Hughley*, 15 N.E.3d at 1004. As our supreme court has succinctly stated, "summary judgment is not a summary trial." *Id.* at 1003-04 (quotations omitted).

[39] Lanni emphasizes that a "trial" can be on a question of fact or on a question of law. As such, she cites Harvey's Indiana Practice for the proposition that,

"[e]ven if there is no factual dispute, certainly a legal dispute is present. In that sense, a summary judgment is very much a 'trial' as the word is used in [Rule] 76(C)(3) . . . ." William F. Harvey, 4A Ind. Prac. § 76.10, at 211 (3d ed. 2003) (hereinafter "Harvey").

[40] Harvey's conclusion is based on two Indiana cases, both of which are 1984 decisions. The first is a February 1984 decision of this court. In that case, this court stated:

> It is black letter law that a trial is an investigation under the direction and control of the state for the purpose of the discovery of the truth and establishing the facts on which the sentence of the law may be pronounced. 28 I.L.E. Trial, Sec. 1 (1960). We do not believe the label attached, be it hearing or trial, is determinative. It has been held in a mechanic's lien foreclosure suit, that attorney fees are a severable issue.
>
> We conclude, therefore, that the determination of attorney fees is an issue in itself. Since T.R. 76(5) [now Trial Rule 76(C)(3)] does not by its terms limit a change of venue to a situation where a new trial is granted on all issues, and since [former Appellate Rule] 15(N) [now Appellate Rules 66(C)(3) and (D)] provides for a new trial on one or more of the issues, a party receiving a new trial or reversal is entitled to a change of venue from the county, if timely filed, even on one or more but less than all the issues.
>
> It is true that when a cause is remanded and no new trial is ordered the change of venue rule may not apply. Also, *it may be true under some circumstances where judgment is rendered upon default, dismissal, or summary judgment, that no trial was conducted and thus a request for a new trial is inappropriate*. Since the original ruling on attorney fees was on default, and it was upon that default that a

retrial was ordered, it is arguable that such new proceeding was not a new trial. *However, we need not decide that question. . . .*

*Berkemeier v. Rushville Nat'l Bank*, 459 N.E.2d 1194, 1198 (Ind. Ct. App. 1984) (emphases added; some citations omitted).

[41]     While *Berkemeier* reserved the issue Lanni now raises, in November of 1984—that is, after *Berkemeier*—the Indiana Supreme Court squarely rejected an argument identical to Lanni's under the prior version of the Trial Rules. As that court stated:

> . . . [The Appellant's] claim pertains to Ind. R. Tr. P. 76(5) [now Rule 76(C)(3)] . . . .
>
> [The Appellant] . . . contends that[,] inasmuch as a summary judgment hearing is a trial, the Court of Appeals ordered a new trial when it remanded [the] cause to the trial court. [Appellees] counter by claiming that a summary judgment decision is not a trial and the Court of Appeals therefore did not order a new trial but . . . affirmed the summary judgment entered . . . and merely ordered the trial court to continue its hearing to further consider certain specific matters . . . . [Appellees] are correct on both of these contentions.
>
> [Appellees] are correct to assert that *a summary judgment decision is not a trial*. This Court has held that the hearing on a motion for summary judgment is not a trial within the meaning of [another trial rule]. *McAllister v. State*, (1972) 258 Ind. 238, 280 N.E.2d 311. With regard to what constitutes a trial, *McAllister* provided: *"A 'trial' normally embraces a controversy and a hearing of evidence to determine issues of fact."* Of course, the determination of a motion for summary judgment is based upon the proposition that there is no issue of fact to be determined and a trial is unnecessary. The Court of Appeals

> also has held that a summary judgment proceeding is not a trial. *Brames v. Crates*, (1980) Ind. App., 399 N.E.2d 437.

*State ex rel. Sink & Edwards, Inc. v. Hancock Superior Ct.*, 470 N.E.2d 1320, 1321-22 (Ind. 1984) (emphases added).

[42] Harvey acknowledges that *Hancock Superior Court* "squarely addressed" whether "a disposition on a summary judgment [is] a 'trial' so that a 'new trial' occurs under [Rule] 76(C)(3) if the judgment is set aside and a trial is ordered."[8] Harvey, *supra*, at 210-11. Harvey further acknowledges that "[t]he opinion in *Hancock Superior Court* is well-supported by earlier cases." *Id.* at 211. Nonetheless, Harvey asserts that the parties in the *Hancock Superior Court* case "did not raise Appellate Rule 15's [now Appellate Rule 66(C)(3) and (D)'s] flexibility and diversification" to the supreme court, and, if raised, "the Supreme Court might be guided by the *Berkemeier* rationale . . . . *Berkemeier* is recommended for that reason." *Id.*

[43] We have two concerns with the Harvey analysis. First, *Berkemeier* did *not* hold that a summary judgment was a trial under the prior version of Trial Rule 76(C)(3). 459 N.E.2d at 1198. Rather, the *Berkemeier* court expressly did *not* decide that question. *Id.* Second, insofar as *Berkemeier* left that question open, our supreme court's subsequent decision in *Hancock Superior Court* expressly

---

[8] Conspicuously absent from both Lanni's initial brief and her reply brief is any mention of the *Hancock Superior Court* case even though Harvey, the authority Lanni does rely on, and the NCAA discuss it (the USFA cites *McAllister*, cited in *Hancock Superior Court*, which Lanni also disregards).

closed it. 470 N.E.2d at 1321-22. This court is in no position to ignore express holdings of the Indiana Supreme Court. *Horn v. Hendrickson*, 824 N.E.2d 690, 695 (Ind. Ct. App. 2005).

[44] Moreover, the Indiana Supreme Court's holding in *Hancock Superior Court* is a sound rule. Once a trial court has assessed the weight or credibility that should attach to certain facts, that assessment is not subject to review. *E.g.*, *Hughes v. City of Gary*, 741 N.E.2d 1168, 1172 (Ind. 2001) (holding that, when reviewing a trial court's findings of fact, we "do not reweigh the evidence or determine the credibility of witnesses"). Thus, if a trial court that has made such an assessment has its judgment reversed on appeal with the matter remanded, Rule 76(C)(3) allows the parties to move for a new trial judge to have the weight and/or credibility of the evidence newly assessed. *E.g.*, *Diehl v. Clemons*, 12 N.E.3d 285, 298 (Ind. Ct. App. 2014) (holding that the trial court erred when it ordered a new trial on the basis of juror misconduct and stating that, "[o]n remand, the trial court should consider recusing itself since it has already determined that the juror was biased") (quotation and ellipses omitted), *trans. denied*. But these concerns are not present for questions of law, which are reviewed on appeal de novo. *E.g.*, *Hughley*, 15 N.E.3d at 1003. And the entry of summary judgment necessarily precludes an assessment of the weight of the evidence or the credibility of the witnesses and is, instead, judgment as a matter of law. *Id.*

[45] Accordingly, *Hancock Superior Court* requires a new trial judge on remand and upon motion by a party only when the trial court's earlier judgment included an

assessment of the weight of the evidence or the credibility of the witnesses. 470 N.E.2d at 1321-22. As the entry of summary judgment reversed in *Lanni I* did not include, and could not have included, any such factual determination, *Hancock Superior Court* precluded the application of Rule 76(C)(3) on remand. Thus, we reject Lanni's argument on this issue.[9]

## Conclusion

[46]  In sum, the evidence most favorable to Lanni fails to demonstrate that either the NCAA or the USFA owed her a duty of care. Lanni also was not entitled to a new judge following this court's remand in *Lanni I*. Thus, we affirm the trial court's entry of summary judgment for the NCAA and the USFA.

[47]  Affirmed.

Baker, J., and Friedlander, J., concur.

---

[9] Aside from arguing that it should win on the merits of this argument, in its brief the NCAA also asserts that the court's denial of the July 11 Motion was an interlocutory order that is not within this court's jurisdiction in this appeal. This argument is plainly incorrect. The trial court's summary judgment orders were final, appealable orders. *See* Appellant's App. at 20, 22 (certifying the summary judgment orders as final, appealable order under Trial Rule 54(B)). And it is well-established law that interlocutory orders need not be separately appealed; they are within the final judgment. *See, e.g.*, *Keith v. Mendus*, 661 N.E.2d 26, 35 (Ind. Ct. App. 1996) ("a party who fails to bring an interlocutory appeal . . . may nevertheless pursue appellate review after the entry of final judgment."), *trans. denied*.