

IN THE

# Court of Appeals of Indiana

Christopher Riggs, as Personal Representative of the
Estate of Charles A. Riggs, and Stephanie Riggs,

*Appellants-Plaintiffs*



FILED

Apr 07 2026, 9:01 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

v.

National Collegiate Athletic Association,

*Appellee-Defendant*

April 7, 2026

Court of Appeals Case No.
25A-CT-571

Appeal from the Marion Superior Court

The Honorable Timothy W. Oakes, Judge

Trial Court Cause No.
49D02-2204-CT-12255

**Opinion by Judge Weissmann**
Judge May concurs.
Judge Kenworthy concurs in part and dissents in part
with a separate opinion.

**Weissmann, Judge.**

Charles Riggs, who played football for Texas A&M University in the 1960s, died in 2020 after developing Chronic Traumatic Encephalopathy (CTE), a neurodegenerative brain disease. Riggs's estate and spouse (collectively, the Estate) then sued the NCAA for negligently causing Riggs to suffer repetitive head trauma during his college football career. The Estate's general contention is that the NCAA's role in regulating college football in the 1960s created legal duties to individual student athletes—duties that, if breached, could support tort liability for injuries the athletes sustained while playing the game.

The trial court found the NCAA owed Riggs no duty of care as a matter of law and entered summary judgment in the NCAA's favor. The Estate appeals, arguing that the NCAA owed Riggs: (1) a general duty of protection from the risks and dangers of repetitive head trauma in college football; and (2) various assumed duties related to those risks and dangers. According to the Estate, the general duty arose from the NCAA's founding purpose to make college football safer, and the assumed duties arose from the NCAA's voluntary undertaking to

provide safety-related services for the student athletes of its member institutions. Neither theory succeeds, and we therefore affirm.[1]

## Facts

In 1906, after a season of college football marred by brutal injuries and player deaths nationwide, President Theodore Roosevelt pressed college leaders to reform the sport or face its elimination. In response, the NCAA was created with a goal of protecting "the safety of college athletes." Appellant's App. Vol. II, pp. 225-26. Over the next 50 years, the NCAA took the following pertinent actions to make football safer:

- **1916** – published the first *NCAA Football Rules Code*.

- **1933** – published the first *NCAA Handbook on the Prevention and Care of Athletic Injuries* (*NCAA Injury Handbook*).

- **1939** – modified the *NCAA Football Rules Code* to require all football players to wear helmets.

- **1964** – modified the *NCAA Football Rules Code* to prohibit deliberate and malicious use of the helmet or head to ram an opponent.

The 1933 *NCAA Injury Handbook* provided NCAA member institutions with guidance on the prevention, diagnosis, and care of various athletic injuries,

---

[1] We conducted oral argument in this case on October 28, 2025, at DePauw University. We thank the University's administration and students for their generosity in hosting the argument. We also thank the parties' counsel for their participation and advocacy.

including "concussion of the brain." Appellant's App. Vol. III, p. 173. Among other things, the handbook advised: "Head injuries, while perhaps not so numerous as others, may be[] and often are more severe in their immediate and remote consequences." *Id.* at 171. It also explained:

> There is definitely a condition described as "punch drunk[,]" and often recurrent concussion cases in football and boxing demonstrate this. Any individual who is knocked unconscious repeatedly on slight provocation should be forbidden to play body-contact sport.

*Id.* at 175.

[5] From 1965 to 1968, Riggs played football for Texas A&M—an NCAA member institution. He allegedly sustained "numerous brain injuries" and "unlimited sub-concussive impacts" during his time as a student athlete. *Id.* at 211. And in his post-college years, he experienced various symptoms of degenerative brain disease, including "significant mental and cognitive decline." *Id.* at 212. After his death in 2020, Riggs was diagnosed with Stage III/IV CTE.

[6] In 2022, the Estate sued the NCAA for Riggs's wrongful death, among other negligence-based claims. The Estate's complaint specifically alleged:

> As a direct and proximate result of the NCAA's negligent and careless acts and omissions, [Riggs] sustained repetitive sub-concussive and concussive brain impacts during his college football career that increased his risk, and later in his life did in fact cause, a neurodegenerative brain disease, namely CTE, that ultimately caused his death.

*Id.* at 217.

[7] The Estate eventually moved for partial summary judgment on its complaint, asking the trial court to hold as a matter of law that the NCAA owed Riggs: (1) a general duty of protection from the risks and dangers of repetitive head trauma in college football; and (2) various assumed duties of care related to those risks and dangers. According to the Estate, the NCAA's assumed duties were based on its alleged undertaking to perform various services for the student athletes of its member institutions.

[8] The evidence designated in support of the Estate's motion for partial summary judgment included the 1933 *NCAA Injury Handbook* and recorded comments made during a roundtable discussion on "Athletic Injuries" at the NCAA's 1932 Annual Convention. In these comments, one NCAA representative acknowledged that "[t]here is an accumulative sensitive condition of the nervous system, brought about by repeated shocks to the head." Appellant's App. Vol. V, p. 151. And another warned that "[a] man who has been subjected to . . . repeated concussions in football may suffer five, ten, fifteen years later rather serious results." *Id.*

[9] The designated evidence also included the NCAA By-Laws in effect when Riggs played football at Texas A&M as well as a document entitled, "Official Procedure Governing the N.C.A.A. Enforcement Program." *Id.* at 55, 105, 157, 211. At all relevant times, the latter granted the NCAA authority to discipline

member institutions for violating NCAA rules. Meanwhile, the By-Laws established the general framework under which the NCAA would operate.

[10] Among other things, the By-Laws created a Committee on Competitive Safeguards and Medical Aspects of Sport (Safeguards Committee). According to Article 3, Section 1:

> The [Safeguards] Committee shall collect and develop pertinent information regarding desirable training methods, prevention and treatment of sports injuries and utilization of sound safety measures at the college level. The Committee shall disseminate such information as might appropriately be brought to the attention of the Association's membership, and recommend the establishment of policies and standards designed to better training methods and the safety factor in college athletics.

Appellee's App. Vol. II, pp. 35, 85, 135, 188.

[11] The By-Laws also created Rules Committees for various sports, including football. According to Article 3, Section 2: "It shall be the duty of the [Rules Committees] to establish and maintain rules of play in their respective sports consistent with sound tradition of the respective sports and of such character as to insure good sportsmanship and healthful participation by the competitors." *Id.* at 36, 85, 136, 188.

[12] Following the Estate's summary judgment motion, the NCAA filed a cross-motion for summary judgment, asking the trial court to hold as a matter of law that the NCAA did not owe Riggs any of the duties alleged by the Estate. Among the evidence designated in support of the NCAA's motion were the

NCAA Constitutions in effect when Riggs played football at Texas A&M. Article III, Section 2 of the NCAA Constitution provided: "The control and responsibility for the conduct of intercollegiate athletics shall be exercised by the institution itself and, in the case of institutions having a membership in a regional athletic conference, by such conference." Appellee's App. Vol. II, pp. 23, 73, 123, 175. The NCAA also designated an affidavit establishing that it "did not hire, train, certify, or compensate coaches, trainers, or team doctors who worked for Texas A&M" when Riggs played football there. *Id.* at 18.

[13] Without issuing findings of fact or conclusions of law, the trial court denied the Estate's motion for partial summary judgment, granted the NCAA's cross-motion, and entered summary judgment in favor of the NCAA on the Estate's complaint. The Estate appeals.

## Discussion and Decision

[14] When reviewing a summary judgment ruling, we apply the same standard as the trial court. *Wagner v. Yates*, 912 N.E.2d 805, 808 (Ind. 2009). "We do not weigh the evidence[] but will consider the facts in the light most favorable to the non-moving party." *Id.* Summary judgment is proper only if "the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C).

[15] Here, the Estate contends summary judgment was inappropriate because the designated evidence established genuine issues of material fact as to whether the

NCAA was negligent. "The essential elements for a negligence action are '(1) a duty owed to the plaintiff by the defendant, (2) a breach of the duty, and (3) an injury proximately caused by the breach of duty.'" *Yost v. Wabash Coll.*, 3 N.E.3d 509, 515 (Ind. 2014) (quoting *Pfenning v. Lineman,* 947 N.E.2d 392, 398 (Ind. 2011)). But the parties' cross-motions for summary judgment only concerned the element of duty. "Where there is no duty, there can be no breach, and thus the party cannot be found negligent." *Id.*

"Generally, whether a duty exists is a question of law for the court to decide." *Rhodes v. Wright*, 805 N.E.2d 382, 386 (Ind. 2004). "Sometimes, however, the existence of a duty depends upon underlying facts that require resolution by the trier of fact." *Id.* "[W]hen found to exist," the duty is "to exercise reasonable care under the circumstances." *Carter v. Ind. Power & Light Co.*, 837 N.E.2d 509, 515 (Ind. Ct. App. 2005). This duty "never changes," but "the standard of conduct required to measure up to [it] varies depending upon the particular circumstances." *Id.*

## I.    General Duty Claim

The Estate first argues that the NCAA owed Riggs a general duty of protection from the risks and dangers of repetitive head trauma in college football. To determine whether the NCAA owed Riggs this general duty, the Estate urges this Court to apply the test articulated in *Webb v. Jarvis*, 575 N.E.2d 992 (Ind. 1991). There, our Supreme Court concluded that whether a duty of care exists at common law is determined by balancing three factors: "(1) the relationship

between the parties, (2) the reasonable foreseeability of harm to the person injured, and (3) public policy concerns." *Id.* at 995. The Court, however, has since clarified that the *Webb* test is only appropriate "in those instances where the element of duty has not already been declared or otherwise articulated." *N. Ind. Pub. Serv. Co. v. Sharp*, 790 N.E.2d 462, 465 (Ind. 2003).

[18] The NCAA contends that applying *Webb* in this case is unnecessary because the pertinent duty question was already resolved in *Yost v. Wabash College*, 3 N.E.3d 509, 521 (Ind. 2014) (holding national fraternity did not owe fraternity pledge general duty of protection against hazing by other student members of local fraternity chapter). From *Yost*, the NCAA extracts the principle that a national membership organization does not owe a general duty of protection to the individual participants of its member institutions unless the organization has direct oversight and control over those participants. The NCAA then argues that this principle forecloses the general duty of protection alleged by the Estate. But as discussed below, the NCAA reads *Yost* too broadly. We therefore find the *Webb* test applies; however, we ultimately conclude the NCAA did not owe Riggs a general duty of protection under that test.

## A. *Yost* Does Not Control

[19] In *Yost*, a fraternity pledge—Brian Yost—was injured when he was hazed by other student members of his local fraternity chapter at Wabash College. 3 N.E.3d 509, 513 (Ind. 2014). Yost sued the national fraternity for negligence, alleging it had a general duty to protect the pledges of its local chapters from

hazing. This allegation was based on the national fraternity's strong disapproval of hazing, its provision of educational information discouraging the practice, and its authority to discipline both local chapters and their student members for engaging in it.

On those facts, our Supreme Court concluded the national fraternity did not owe Yost a general duty of protection under the three-factor *Webb* test. *Id.* at 521. Without addressing the foreseeability factor (*i.e.*, whether the national fraternity knew or should have known that injurious pledge hazing was reasonably likely to occur in its local chapters), the Court explained:

> [T]he parties' relationship and public policy concerns undermine Yost's claim of duty on the part of the national fraternity under the designated facts most favorable to Yost. The national fraternity lacked any **direct oversight and control** of the individual fraternity members. It did not have any employees present in the fraternity house, and the day-to-day management of the house was the responsibility of the local fraternity, not the national fraternity. Despite the national fraternity's efforts to establish aspirational objectives and to promote their fulfillment, the relationship between the national fraternity and the individual student members was remote and tenuous. Public policy concerns likewise do not favor recognition of a specific duty of care toward Yost by the national fraternity. . . . [T]he national organization—with which local fraternities and sororities affiliate—should be encouraged, not disincentivized, to undertake programs to promote safe and positive behavior and to discourage hazing and other personally and socially undesirable conduct.

*Id.* (emphasis added).

[21] Applying *Yost* to the Estate's case, the NCAA argues that it owed Riggs no general duty of protection because it lacked direct oversight and control of the student athletes of its member institutions when Riggs played college football. The designated evidence supports this factual assertion, and the Estate does not argue otherwise. Instead, the Estate claims *Yost* is distinguishable. We agree.

[22] We initially note that the NCAA overstates the holding of *Yost* by reading the case as establishing a categorical rule: absent direct oversight and control, national membership organizations do not have a duty to protect the individual participants of their member institutions. *Yost* did not go that far. Rather, our Supreme Court conducted a fact-specific *Webb* analysis and concluded the national fraternity did not owe the injured fraternity pledge a general duty of protection under the circumstances presented. *Id.* This conclusion was not a broad pronouncement that direct oversight and control is a prerequisite to duty in all cases alleging negligence by a national membership organization.

[23] Moreover, *Yost* is factually distinguishable from the Estate's case. Though both involved an alleged general duty of protection, the purported negligence in *Yost* was the national fraternity's failure to supervise and control the dangerous actions of the local chapter members who hazed the fraternity pledge. Here, the Estate does not contend that the NCAA failed to protect Riggs from his

teammates' actions or even those of opposing players. Rather, the Estate contends the NCAA failed to protect Riggs from the dangers of football itself.[2]

## B.    No Duty Under *Webb*

Although *Yost* is not controlling, the Estate does not prevail under *Webb*, 575 N.E.2d at 995 (identifying three factors to be balanced in determining whether a duty of care exists at common law: (1) the relationship between the parties, (2) the foreseeability of the harm, and (3) public policy concerns).

## 1.    Relationship

We begin by considering the relationship between the NCAA and Riggs. *See Greathouse v. Armstrong*, 616 N.E.2d 364, 368 (Ind. 1993) ("The duty to exercise care for the safety of another arises as a matter of law out of some relationship existing between the parties[.]"). The designated evidence does not establish any direct relationship between the NCAA and Riggs. Under the NCAA Constitutions in effect when Riggs played college football, Texas A&M—not

---

[2] The NCAA also relies on *Lanni v. NCAA*, 42 N.E.3d 542 (Ind. Ct. App. 2015), in which another panel of this Court found *Yost* "controlling" as to whether the NCAA owed a student athlete a general duty of protection from the risks and dangers of fencing while the athlete was spectating a fencing competition held on the campus of a NCAA member institution. *Id.* at 549. Without providing any written analysis, the *Lanni* Court stated: "Simply, we see no daylight between our supreme court's analysis in *Yost* with respect to the relationship between a national fraternity and a student engaged with a local chapter and the relationship between the NCAA and a student-athlete participating at an event on the campus of a member institution." *Id.* The Court therefore held that the NCAA did not owe a general duty of protection as a matter of law.

As with the Estate's case, we view *Lanni* as factually distinguishable from *Yost*. But the *Lanni* Court's limited analysis of the general duty issue prevents us from evaluating the relationship between those distinctions and the holding in that case. We therefore look to *Yost* rather than *Lanni* in evaluating the NCAA's threshold argument that *Webb* need not be applied.

Riggs—was the NCAA member. But "it is well-established that privity is not always required" for a duty of care to arise. *Webb*, 575 N.E.2d at 995. The question, then, is whether the designated evidence establishes an indirect relationship sufficient to support a duty of care.

[26] The Estate claims there existed a duty-worthy relationship between the NCAA and Riggs because "the NCAA has historically acknowledged and accepted specific health and safety responsibilities that it knows 'are, in part, for the benefit of' NCAA athletes." Appellant's Br., p. 25 (quoting *Webb*, 575 N.E.2d at 996).[3] Although the Estate quotes *Webb* in making this claim, it takes the quotation out of context. By doing so, it ignores the *Webb* Court's recognition that a third-party beneficiary relationship supports imposing a duty of care only when there is reliance by the third party. *Webb*, 575 N.E.2d at 996. In context, the *Webb* Court stated:

> [W]e have held that **a professional owes no duty to third persons unless the professional had actual knowledge that those persons would rely on his rendering of professional services**. In such cases, we have recognized that a duty may be owed to a beneficiary of the consensual relationship, akin to that of a third party beneficiary of a contract, where **the professional has actual knowledge that the services being provided are, in part, for the benefit of such third persons**.

---

[3] The Estate does not assert an assumed duties claim under the Restatement (Third) of Torts: Liability for Physical & Emotional Harm § 43 (2012), which concerns duties owed to a third person based on undertakings to another (*e.g.*, duties the NCAA may have owed Riggs based on services it undertook to perform for Texas A&M). *See infra* ¶¶ 38-39 (discussing the Estate's assumed duties claim).

*Webb*, 575 N.E.2d at 996 (emphasis added, internal citation omitted) (also stating, "a professional is not liable to third persons who rely on his conclusions or opinions unless the professional had actual knowledge that those third persons would have such reliance").

Here, the designated evidence does not show that Riggs ever relied on the NCAA to minimize the risks and dangers of repetitive head trauma in college football or to otherwise make the sport safer. And such reliance cannot be inferred simply because the NCAA was founded with the goal of protecting the safety of college athletes. The *Webb* relationship factor therefore weighs against imposing a general duty of protection on the NCAA.

## 2. Foreseeability

Next, we consider the foreseeability of harm to Riggs. *See Webb*, 575 N.E.2d at 997 ("Imposition of a duty is limited to those instances where a reasonably foreseeable victim is injured by a reasonably foreseeable harm."). This inquiry does not ask whether the defendant foresaw the specific harm to the specific plaintiff. *Goodwin v. Yeakle's Sports Bar & Grill, Inc.*, 62 N.E.3d 384, 393 (Ind. 2016). Rather it "'requires a more general analysis of the broad type of plaintiff and harm involved, without regard to the facts of the actual occurrence.'" *Id.* (quoting *Goldsberry v. Grubbs*, 672 N.E.2d 475, 479 (Ind. Ct. App. 1996)).

Here, the Estate correctly frames the relevant inquiry as whether it was foreseeable that student athletes, like Riggs, might suffer repetitive head trauma while playing college football for NCAA member institutions, like Texas A&M.

The designated evidence shows that such harm to such victims was reasonably foreseeable. By the time Riggs played college football in 1965, the NCAA had known for decades about the general risks and dangers of repetitive head trauma in the sport.

[30] Most notably, an NCAA representative warned in 1932 that a player "subjected to . . . repeated concussions in football may suffer five, ten, fifteen years later rather serious results." Appellant's App. Vol. V, p. 151. And the following year, the NCAA published the 1933 *NCAA Injury Handbook*, which similarly warned that head injuries "may be, and often are more severe in their immediate and remote consequences." Appellant's App. Vol. III, p. 171. The *Handbook* also described a "punch drunk" condition often demonstrated by football players with "recurrent concussion[s]," for which the NCAA advised: "Any individual who is knocked unconscious repeatedly on slight provocation should be forbidden to play body-contact sport." *Id.* at 175.

[31] Thus, the NCAA had over 30 years of institutional knowledge about the risks and general long-term dangers of repetitive head trauma in college football before Riggs ever took the field for Texas A&M. The *Webb* foreseeability factor therefore weighs in favor of imposing a general duty of protection on the NCAA.

### 3. Public Policy

[32] Finally, we consider the public policy concerns surrounding the alleged duty. *See Webb*, 575 N.E.2d at 997 ("Duty is not sacrosanct in itself, but is only an

expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." (citation omitted)). "Various factors" can play into our policy consideration, "including convenience of administration, capacity of the parties to bear the loss, a policy of preventing future injuries, the moral blame attached to the wrongdoer, and many others." *Gariup Const. Co. v. Foster*, 519 N.E.2d 1224, 1227 (Ind. 1988).

[33] The Estate focuses on preventing future injuries to student athletes. It claims public policy weighs in favor of imposing a general duty of protection on the NCAA because, despite foreseeing the risk of harm in the 1930s, the NCAA did not implement concussion management rules until 2010. In support of this claim, the Estate points to emails from 2009 in which NCAA representatives discussed the NCAA's potential liability exposure without such rules. The Estate contends "[t]his proves the NCAA responds better to the threat of liability than it does to any moral obligations." Appellant's Br., p. 31. But the NCAA's post-1968 conduct is not an appropriate gauge of public policy at the time when Riggs played college football.[4]

[34] We further note that the Estate's claim is not that the NCAA caused Riggs's injuries through its own affirmative acts, but rather that the NCAA failed to protect Riggs from the dangers of football itself. "As a general rule, an

---

[4] The designated evidence indicates that, when Riggs played college football, the NCAA had less than 10 employees at its national office. Meanwhile, nearly 450 of the NCAA's member institutions had football programs in which a rough total of 37,000 student athletes participated.

individual does not have a duty to aid or protect another person, even if he knows that person needs assistance." *NFI Interactive Logistics LLC v. Bruski*, 239 N.E.3d 63, 70 (Ind. Ct. App. 2024) (quoting *Baker v. Fenneman & Brown Props., LLC*, 793 N.E.2d 1203, 1206 (Ind. Ct. App. 2003) (cleaned up), *trans. denied*; *see* Restatement (Second) of Torts § 314 (1965) ("The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action.").

[35] Of course, this general rule does not apply "where the peril in which the actor knows that the other is placed is . . . due to any active force which is under the actor's control." Restatement (Second) of Torts § 314 cmt. d. But the Estate does not contend that any active force by the NCAA created or increased the risks and dangers of repetitive head trauma in college football. Rather, the Estate contends the NCAA had an affirmative duty to protect Riggs from those risks and dangers because it generally undertook to make college football safer. As it relates to Riggs, we believe the public policy of the 1960s would have been to encourage the NCAA in its mission rather than discourage it through potential liability to an un-reliant third-party beneficiary. Without more, the *Webb* public policy factor weighs against imposing a general duty of protection on the NCAA.

[36] Under the circumstances of this case, we balance the relationship between the parties, the foreseeability of harm, and public policy concerns and conclude the NCAA did not owe Riggs a general duty of protection as a matter of law.

## II.    Assumed Duties Claim

The Estate next argues that, independent of any general duty, the NCAA assumed specific duties of care toward Riggs by voluntarily undertaking to perform the following services for the student athletes of its member institutions:

> (i) educate and warn about the risks and dangers of playing college football;
>
> (ii) adopt and implement safety rules, policies, standards, and guidelines intended to minimize those risks and dangers; and
>
> (iii) regulate and enforce those rules, policies, standards, and guidelines.

We hereinafter refer to these alleged undertakings as the Education Services, Rules Services, and Enforcement Services, respectively.

Indiana follows the Restatement (Third) of Torts: Liability for Physical & Emotional Harm (2012) in determining whether someone has assumed a duty of care toward another. *Tyus v. Indpls. Power & Light Co.*, 134 N.E.3d 389, 403-04 (Ind. Ct. App. 2019). That treatise (hereinafter, "Restatement (Third)") has two sections on assumed duties. The first is § 42, which concerns duties owed to another person based on undertakings to that person (*e.g.*, duties the NCAA may have owed Riggs based on services it undertook to perform for Riggs). The second is § 43, which concerns duties owed to a third person based on undertakings to another person (*e.g.*, duties the NCAA may have owed Riggs based on services it undertook to perform for Texas A&M).

[39] In moving for partial summary judgment on its assumed duties claim, the Estate relied solely on Restatement (Third) § 42, which states:

> An actor who undertakes to render services to another and who knows or should know that the services will reduce the risk of physical harm to the other has a duty of reasonable care to the other in conducting the undertaking if:
>
> (a) the failure to exercise such care increases the risk of harm beyond that which existed without the undertaking, or
>
> (b) the person to whom the services are rendered or another relies on the actor's exercising reasonable care in the undertaking.

Restatement (Third) § 42.

[40] The Estate claims summary judgment was inappropriate on its Restatement (Third) § 42 claim because the designated evidence established genuine issues of material fact as to whether the NCAA undertook to perform the Education, Rules, and Enforcement Services for Riggs. But the Estate does not contend, and the designated evidence does not show, that there are genuine issues of material fact concerning § 42(a)—that "the failure to exercise such care increases the risk of harm beyond that which existed without the undertaking."[5]

[41] According to the Estate, "Riggs would have been at a significantly lower risk of harm if the NCAA had implemented and enforced rules to minimize the extent

---

[5] In moving for summary judgment, the Estate also made no argument concerning Restatement (Third) § 42(b)—that "the person to whom the services are rendered or another relies on the actor's exercising reasonable care in the undertaking." *See* Appellant's App. Vol. II, p. 183.

and force of repetitive head trauma in college football." Appellant's App. Vol. II, p. 183. The proper inquiry, however, is not whether Riggs's risk of harm would have been lower if the NCAA had exercised reasonable care in performing the alleged services. Section 42(a) hinges on whether the failure to exercise such care "increase[d] the risk of harm *beyond that which existed without the undertaking*." (emphasis added). In other words, the question is not whether the NCAA could have made Riggs safer but whether its involvement made him less safe than he would have been if the NCAA had done nothing at all. The designated evidence does not show this requisite increase in the risk of harm.

[42] The NCAA's alleged failure to implement and enforce rules intended to minimize the risks and dangers of repetitive head trauma in college football could not have increased those risks and dangers beyond that which existed before the NCAA allegedly undertook to perform the Rule and Enforcement Services for Riggs. Under both circumstances, college football purportedly lacked rules intended to minimize the risks and dangers of repetitive head trauma. Thus, the risk of harm was the same either way.

[43] Likewise, the NCAA's alleged failure to educate and warn Riggs about the risks and dangers of repetitive head trauma in college football could not have increased those risks and dangers beyond that which existed before the NCAA allegedly undertook to perform the Education Services for Riggs. Under both circumstances, Riggs purportedly remained unaware of the risks and dangers of repetitive head trauma. Again, the risk of harm was the same either way.

[44] Because the designated evidence does not establish a genuine issue of material fact as to the heightened risk required by Restatement (Third) § 42(a), the Estate's assumed duties claim fails as a matter of law.

## Conclusion

[45] The NCAA was founded because of the general brutality that was occurring in college football in the early 1900s. By the 1960s, when Riggs played football at Texas A&M, the NCAA had undertaken various safety-related responsibilities for its member institutions, including educating them about the sport's risks and dangers, adopting and implementing safety rules and standards, and enforcing those protections against its member schools. Although it was reasonably foreseeable that student athletes, like Riggs, might suffer repetitive head trauma while playing college football, the NCAA did not create or increase the risks and dangers of such injuries.

[46] After balancing the relationship between the parties, the foreseeability of harm, and public policy concerns, we conclude the NCAA did not owe Riggs a general duty of protection as a matter of law. And finding the designated evidence does not establish a genuine issue of material fact as to all the elements required by Restatement (Third) § 42, we conclude the Estate's assumed duties claim fails as a matter of law. We therefore affirm the trial court's entry of summary judgment in favor of the NCAA.

May, J., concurs.
Kenworthy, J., concurs in part and dissents in part with a separate opinion.

ATTORNEYS FOR APPELLANT

Robert T. Dassow
Tyler J. Zipes
Hovde Dassow + Deets, LLC
Indianapolis, Indiana


ATTORNEYS FOR APPELLEE

Brian J. Paul
Patrick H. Reilly
J. Benjamin Broadhead
Faegre Drinker Biddle & Reath LLP
Indianapolis, Indiana

**Kenworthy, Judge, concurring in part and dissenting in part.**

[47] I agree with the majority that Riggs's assumed duties claim based on Restatement (Third) § 42 fails as a matter of law. I further agree that the question of whether the NCAA owed Riggs a general duty of protection must be decided by the *Webb* test because the element of duty in this arena is not well-settled. As for the *Webb* test, I concur with the majority's analysis of two of the three factors: the foreseeability of harm and public policy concerns. But as to the relationship of the parties, I believe genuine issues of material fact exist that preclude summary judgment for either party.

[48] Our Supreme Court has noted the determination of whether a relationship exists that gives rise to a duty "is not without difficulty." *Gariup Constr. Co., Inc. v. Foster*, 519 N.E.2d 1224, 1227 (Ind. 1988). "No better general statement can be made than that the courts will find a duty where, in general, reasonable persons would recognize it and agree that it exists." *Id.* (quoting *Prosser & Keeton on Torts* § 53 at 357-59 (5th ed. 1984)).

[49] As the majority notes, the existence of a duty owed by one party to another in a negligence action is generally a question of law for the court to decide. *See* slip op. at ¶ 16. However, "a factual question may be interwoven with the determination of the existence of a relationship between the parties, making the ultimate determination of the existence of a duty a mixed question of law and fact" to be resolved by the factfinder. *Helmchen v. White Hen Pantry, Inc.*, 685 N.E.2d 180, 181 (Ind. Ct. App. 1997), *trans. denied*.

The legal analysis of whether a relationship exists here is complicated by separate but interrelated concepts: foreseeability and assumption of duty. The foreseeability component of duty is analyzed by focusing on the "general class of persons of which the plaintiff was a member and whether the harm suffered was of a kind normally to be expected—without addressing the specific facts of the occurrence." *Rogers v. Martin*, 63 N.E.3d 316, 325 (Ind. 2016). I agree with the majority that the foreseeability analysis weighs in favor of imposing a duty on the NCAA because it has known about the "general risks and dangers of repetitive head trauma" for decades. Slip op. at ¶ 29. And because the NCAA knew about the risks, it has taken measures over the years to study and address the harm with the knowledge and intent that student-athletes would and could benefit from and rely on the information—measures which pertain to the existence of a relationship.

Further, assuming a duty of care creates a special relationship.[6] *See Yost*, 3 N.E.3d at 517. Whether an assumed duty exists and to what extent is ordinarily a question for the trier of fact. *Delta Tau Delta, Beta Alpha Chapter v. Johnson*, 712 N.E.2d 968, 975 (Ind. 1999). The Estate alleged in its complaint that the NCAA "promulgates and implements standard sport regulations and

---

[6] Although I agree with the majority's resolution of the Estate's Restatement (Third) § 42 assumption of duty claim, and I acknowledge the Estate did not argue a duty exists under Restatement (Third) § 43, evidence of an assumed duty under Section 43 is relevant to the *Webb* relationship analysis. *See Medtronic, Inc. v. Malander*, 996 N.E.2d 412, 420 (Ind. Ct. App. 2013) (noting the precursor to Restatement Section 43 "parallels Indiana's doctrine of assumed duty"); *Tyus v. Indianapolis Power & Light Co.*, 134 N.E.3d 389, 404 (Ind. Ct. App. 2019) (observing the "assumption of such a duty creates a special relationship between the parties"), *trans. denied*.

requirements," including "official policies and guidelines for the treatment and prevention of sports-related injuries [and] return-to-play guidelines" and "holds itself out as both a proponent of and authority on the treatment and prevention of sports-related injuries upon which NCAA athletes [and member institutions] can rely for guidance on player-safety issues." *Appellant's App. Vol. 2* at 197–98. And it alleged Riggs "relied upon the NCAA's authority and guidance to protect his health and safety by treating and preventing head-related injuries[.]" *Id.* The Estate further designated evidence that the NCAA undertook specific measures to protect the student-athletes participating in intercollegiate football.

[52] In replying to the Estate's motion for partial summary judgment and advancing its own motion, the NCAA designated evidence explaining the NCAA's "structure and governance framework" under which member schools (and regional conferences, if any) exercised direct control of and responsibility for the day-to-day conduct of intercollegiate athletics and the NCAA "administratively support[ed]" them. *Appellant's App. Vol. 6* at 87–88. The NCAA also pointed to the absence of any evidence that the NCAA had direct contact with student-athletes in general or with Riggs specifically. In short, the NCAA claims the relationship between Riggs and itself was "remote and tenuous," not the sort of relationship that gives rise to a duty. *Appellee's Br.* at 12 (quoting *Lanni*, 42 N.E.3d at 549).

[53] But the Estate designated evidence showing the NCAA was born in the early 1900s out of concern for student-athlete health and safety. *See Appellant's App. Vol. 2* at 225 (NCAA Trial Rule 30(B)(6) witness Terri Gronau testifying that

the NCAA was founded "in order to make football safer"); *Appellant's App. Vol. 5* at 207 (then-NCAA President Dr. Mark Emmert testifying that "health and safety of student-athletes is . . . one of the guiding principles as to why the NCAA was formed"). Designated evidence further shows over a century later, the NCAA continues to acknowledge its responsibility to "do everything reasonable to create rules, policies, practices, guidance, [and] all the tools that are reasonably available to minimize" the risk of injuries to student-athletes. *Appellant's App. Vol. 5* at 208 (Dr. Emmert 2021 deposition testimony). That includes the obligation "to share pertinent health and safety information it's aware of with its members." *Appellant's App. Vol. 3* at 7.

[54] To that end, the NCAA has recognized "it's a critically important function for the association" to "continue to . . . develop medical science and provide guidance . . . that's based upon best practices." *Appellant's App. Vol. 5* at 207. And the NCAA has conceded student-athletes "can rely on the NCAA for health and safety information." *Appellant's App. Vol. 3* at 8 (deposition testimony of Gronau); *see also id.* at 19 (statement of David Klossner, NCAA Director of Health & Safety, before the House Committee on the Judiciary on January 4, 2010: "Participation in intercollegiate athletics involves unavoidable exposure to an inherent risk of injury. However, student-athletes rightfully assume that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risks of injury from athletics participation").

[55] As has been frequently observed over the last decade, "Indiana consciously errs on the side of letting marginal cases proceed to trial on the merits, rather than

risk short-circuiting meritorious claims." *Hughley v. State*, 15 N.E.3d 1000, 1004 (Ind. 2014). Summary judgment is a "high bar" in Indiana: the moving party must affirmatively negate the opponent's claim. *Id.* I would hold the NCAA has failed to meet that high bar in this case. The designated evidence is at least minimally sufficient to demonstrate the NCAA knows its efforts surrounding health and well-being in sport are provided for the benefit of student-athletes. *See Goodwin v. Yeakle's Sports Bar & Grill, Inc.*, 62 N.E.3d 384, 386 (Ind. 2016) ("Any doubt as to any facts or inferences to be drawn [from the designated evidence] must be resolved in favor of the non-moving party."). In attending a member school, those student-athletes submit to the rules of play set by the NCAA and place their confidence in the NCAA to promote their health and safety while they participate in their sport. In this regard, this case differs significantly from *Yost*. There, the incident in which the plaintiff was injured was contrary to the "aspirational objectives" of the national organization. *See Yost*, 3 N.E.3d at 521. Here, Riggs was allegedly injured while playing a sanctioned game according to the rules and guidance created and enforced by the NCAA. And there is at least one other important point that distinguishes this case from *Yost*. In concluding the national fraternity in *Yost* did not assume a duty upon which the fraternity pledge could claim liability for negligent performance, the Supreme Court noted: "[The plaintiff] does not predicate his claim on alleged negligence by the national fraternity in the formulation and dissemination of its educational material—the specific services arguably undertaken by the national fraternity." 3 N.E.3d at 521. Unlike the plaintiff in

*Yost*, the Estate's claim here *does* take issue with the specific measures the NCAA undertook to perform on behalf of Riggs and other student-athletes.

In sum, I believe the designated evidence leaves the existence of a special relationship between the NCAA and Riggs unclear. I would leave it to a factfinder to determine whether a special relationship giving rise to a recognizable duty exists.

I therefore concur in part and respectfully dissent in part.